Slip Op. No. 18-35

# UNITED STATES COURT OF INTERNATIONAL TRADE

QINGDAO QIHANG TYRE CO., LTD.,
et al.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

Before: Timothy C. Stanceu, Chief Judge

Consol. Court No. 16-00075

## <u>OPINION AND ORDER</u>

[Ordering reconsideration of certain aspects of an administrative determination in an antidumping duty proceeding on off-the-road tires from the People's Republic of China]

Dated: April 4, 2018

*Jordan C. Kahn*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., argued for plaintiff Qingdao Qihang Tyre Co., Ltd. With him on the brief was *Brandon M. Petelin*.

*Richard P. Ferrin*, Drinker Biddle & Reath, LLP, of Washington, D.C., argued for plaintiff Trelleborg Wheel Systems (Xingtai) Co., Ltd. With him on the brief was *Douglas J. Heffner*.

*Douglas J. Heffner*, Drinker Biddle & Reath, LLP, of Washington, D.C., argued for plaintiffs Xuzhou Xugong Tyres Co., Ltd., Xuzhou Hanbang Tyre Co., Ltd., and Armour Rubber Co. Ltd. With him on the brief was *Richard P. Ferrin*.

*Brandon M. Petelin*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Free Trade Zone Full-World International Trading Co., Ltd.

*Robert K. Williams*, Clark Hill PLC, of Chicago, Ill., for plaintiff Weihai Zhongwei Rubber Co., Ltd. With him on the brief was *Lara A. Austrins*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and

*Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Paul K. Keith*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Stanceu, Chief Judge:  In this consolidated action, seven plaintiffs contest an administrative determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), issued to conclude a periodic review of an antidumping duty order on off-the-road tires from the People's Republic of China ("China" or the "PRC").[1]  Ruling that certain of the Department's decisions were contrary to law, the court remands the determination to Commerce for appropriate corrective action.

## I. BACKGROUND

### A. The Contested Determination

The determination contested in this litigation (the "Final Results") is *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 23,272 (Int'l Trade Admin. Apr. 20, 2016) ("*Final Results*").  Incorporated by reference in the Final Results is a final "Issues and Decision Memorandum" containing explanatory discussion.  *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2013-2014* (Int'l Trade Admin. Apr. 12, 2016) (P.R. Doc. 334), *available at* https://enforcement.trade.gov/frn/summary/prc/2016-09165-1.pdf (last visited Mar. 30, 2018) ("*Final I&D Mem.*").

---

[1] Consolidated under the lead case, *Qingdao Qihang Tyre Co. v. United States*, Court No. 16-00075, are *Qingdao Free Trade Zone Full-World International Trading Co. v. United States*, Court No. 16-00076; *Trelleborg Wheel Systems (Xingtai) Co. v. United States*, Court No. 16-00077; *Xuzhou Xugong Tyres Co. v. United States*, Court No. 16-00079; and *Weihai Zhongwei Rubber Co. v. United States*, Court No. 16-00084.

## B. Proceedings Conducted by Commerce

Commerce issued an antidumping duty order (the "Order") on certain off-the-road ("OTR") tires from China (the "subject merchandise") in 2008. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008). Commerce initiated the review at issue in this litigation, which was the sixth administrative review of the Order, on October 30, 2014. *Initiation of Antidumping and Countervailing Duty Administrative Review*, 79 Fed. Reg. 64,565 (Int'l Trade Admin. Oct. 30, 2014). The sixth administrative review pertained to entries of subject merchandise made during the period of review ("POR") of September 1, 2013 through August 31, 2014. *Final Results*, 81 Fed. Reg. at 23,272.

Commerce published the preliminary results of the review in October 2015. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 61,166 (Int'l Trade Admin. Oct. 9, 2015) ("*Prelim. Results*"). Commerce incorporated by reference a "Decision Memorandum for Preliminary Results." *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2013-2014* (Int'l Trade Admin. Sept. 30, 2015) (P.R. Doc. 269), *available at* https://enforcement.trade.gov/frn/summary/prc/2015-25804-1.pdf (last visited Mar. 30, 2018) ("*Prelim. I&D Mem.*").

In the Final Results, Commerce assigned individually-determined weighted-average dumping margins to two groups of Chinese companies: Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, "Xugong"), which

Commerce treated as a single entity for purposes of the review; and Qingdao Qihang Tyre Co.,

Ltd. ("Qihang"). *Final Results*, 81 Fed. Reg. at 23,272.  Having selected these

exporters/producers of OTR tires as "mandatory" respondents, i.e., respondents it intended to

examine individually, Commerce assigned a weighted-average dumping margin of 65.33% to

Xugong and a weighted-average dumping margin of 79.86% to Qihang in the Final Results.  *Id.*

at 23,273.  Commerce assigned a weighted average of these two margins, 70.55%, to

respondents that it did not select for individual examination but that Commerce found to have

qualified for a "separate rate" based on demonstrated independence from the government of

China.  *Id.*

### C. The Parties to this Consolidated Case

The plaintiffs in this litigation are Qihang and Xugong, i.e., the two mandatory

respondents, and the following separate rate respondents: Qingdao Free Trade Zone Full-World

International Trading Co., Ltd. ("Full World"), Trelleborg Wheel Systems (Xingtai) Co., Ltd.

("Trelleborg" or "TWS Xinghai"), and Weihai Zhongwei Rubber Co., Ltd. ("Weihai

Zhongwei").[2]

### D. Proceedings before the Court

The five actions consolidated in this litigation were each commenced between

April 29, 2016 and May 12, 2016.  Before the court are plaintiffs' motions for judgment on the

agency record brought under USCIT Rule 56.2, all of which are opposed by defendant United

States.  Defendant advocates that the court sustain the Final Results in all respects.  *See* Def.'s

---

[2] Titan Tire Corporation and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC intervened as defendant-intervenors in this case and the cases consolidated under this case, *see* Order (May 31, 2016), ECF No. 18, but withdrew from these cases on September 29, 2017.  *See* Order (Sept. 29, 2017), ECF No. 66.

Resp. to Mots. for J. on the Agency R. (June 7, 2017), ECF No. 44 ("Def.'s Br."). The court

held oral argument on November 30, 2017. *See* Order (Aug. 3, 2017), ECF No. 60.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c),[3] pursuant to which the court reviews actions commenced under section

516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C. § 1516a, including an

action contesting a final determination that Commerce issues to conclude an antidumping duty

administrative review. In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

### B. Summary of the Parties' Claims and the Court's Rulings

Qihang and Xugong have three claims in common. *See* Pl.'s Mem. of Law in Supp. of

Mot. for J. on the Agency R. Pursuant to Rule 56.2 (Dec. 7, 2016), ECF No. 35 ("Qihang's Br.");

Mem. of P. & A. of Pls. Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou

Hanbang Tyre Co., Ltd. in Supp. of their Mot. for J. on the Agency R. (Dec. 7, 2016), ECF

Nos. 32 (conf.), 33 (public) ("Xugong's Br."). Both claim that Commerce, when determining the

export prices or constructed export prices of the sales of their subject merchandise, erred in

making deductions for unrefunded value-added tax ("VAT") incurred in China. Qihang's

Br. 5-15; Xugong's Br. 71-78. They also claim that the Department's calculation of a

"surrogate" value for one of their production materials, reclaimed rubber, was not supported by

---

[3] All citations to the United States Code herein are to the 2012 edition, and all citations to the Code of Federal Regulations herein are to the 2016 edition, except where otherwise indicated.

substantial evidence on the record.  Qihang's Br. 33-54; Xugong's Br. 23-38.  In their third claim in common, both contest the method by which Commerce valued foreign inland freight in China. Qihang's Br. 15-33; Xugong's Br. 38-44.  In this Opinion and Order, the court explains why it believes a remedy is necessary in response to each of these three claims of the two mandatory respondents.

Xugong claims, additionally, that Commerce erred in not choosing Peru as the market-economy country it would use as a primary surrogate country, *see* Xugong's Br. 5-23, and that Commerce unlawfully resorted to facts otherwise available and an adverse inference for certain sales Commerce determined to have been unreported in the review, *see id.* at 44-71.  The court does not find merit in these two additional claims of Xugong.

Trelleborg claims that Commerce acted contrary to law in assigning it the margin of 70.55% that Commerce assigned to all separate rate respondents.  Mem. of P. & A. of Pl. Trelleborg Wheel Systems (Xingtai) Co., Ltd. in Supp. of its Mot. for J. on the Agency R. (Dec. 7, 2016), ECF Nos. 30 (conf.), 31 (public) ("Trelleborg's Br.").  The court rules that Commerce acted in accordance with law in assigning to Trelleborg an all-others rate.

Like Trelleborg, Full World and Weihai Zhongwei were assigned the all-others rate of 70.55% in the sixth administrative review.  As plaintiffs in this case, they seek relief in the form of a redetermined all-others rate based on any revision to the rates of the examined respondents that ultimately is made as a result of judicial review.  Mem. of Law in Supp. of Pl. Qingdao Free Trade Zone Full-World Int'l Trading Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency R. (Dec. 7, 2016), ECF No. 34; Mem. of Law in Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Dec. 7, 2016), ECF No. 36.  The court rules in favor of these two plaintiffs and also rules that Trelleborg will be assigned the redetermined all-others rate.

C. Adjustment to Export Price and Constructed Export Price for Irrecoverable Value-Added Tax

Under section 731 of the Tariff Act, 19 U.S.C. § 1673, an antidumping duty is imposed "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. Section 772 of the Tariff Act, 19 U.S.C. § 1677a, determines export price ("EP") and constructed export price ("CEP") by making various adjustments to "[t]he price used to establish export price and constructed export price," 19 U.S.C. § 1677a(c); Commerce refers to the unadjusted price for determining EP and CEP as the "starting price."[4]  *See* 19 C.F.R. § 351.402(a).

The statutory provision at the center of the Xugong's and Qihang's value-added tax claims is section 772(c)(2)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(B), which effects a downward adjustment in EP and CEP starting prices and thereby increases any dumping margin. The provision directs Commerce to reduce the starting price by "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title."[5]  19 U.S.C. § 1677a(c)(2)(B).

---

[4] The starting price for determining export price is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a). The starting price for determining constructed export price is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." *Id.* § 1677a(b).

[5] An export tax, duty, or other charge described in 19 U.S.C. § 1677(6)(C) is an export tax, duty, or other charge "levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received." 19 U.S.C. § 1677(6)(C).

For the Final Results, Commerce made several findings concerning value-added tax

incurred in China by the two mandatory respondents.  Among them was a finding that the

respondents incurred VAT of 17% and were refunded 9%, which Commerce described as "the

rebate rate for exported goods."  *Final I&D Mem.* at 23 ("the record makes clear that exporters

of OTR tires will pay 17 percent VAT and be refunded only nine percent . . . ."); *id.* at 24

("according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate

rate for subject merchandise is nine percent.").  Concluding that the portion of the VAT that was

not "rebated" or "refunded" due to exportation, to which Commerce referred as "irrecoverable"

VAT, is an "export tax, duty, or other charge" within the meaning of 19 U.S.C. § 1677a(c)(2)(B),

Commerce made downward adjustments to the EP or CEP starting prices of both mandatory

respondents.  *Id.* at 24.  Further finding that the irrecoverable VAT was the difference between

the 17% "standard VAT levy" and the 9% "rebate" rate, i.e., 8%, Commerce reduced both

respondents' EP or CEP starting prices by an amount it calculated as 8% of the free-on-board

("FOB") value of the exported subject merchandise.[6]  *Id.* at 23-24.  This adjustment to the

---

[6] In the Final Issues and Decision Memorandum, Commerce defined Chinese irrecoverable VAT as follows: "Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods."  *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2013-2014* at 23 (Int'l Trade Admin. Apr. 12, 2016) (P.R. Doc. 334), *available at* https://enforcement.trade.gov/frn/summary/prc/2016-09165-1.pdf (last visited Mar. 30, 2018) ("*Final I&D Mem.*").  In support of this general definition, Commerce, rather than cite record evidence pertaining to the taxes incurred by the exporters in this review, cited its own decision in a previous proceeding.  *Id.* at 23 n.132 (citing "*Prestressed Wire/PRC* and accompanying Issues and Decision Memorandum, at Comment 1, n. 35.").  The court notes that this general definition is inconsistent with the Department's own factual finding, which is discussed in this Opinion and Order, that the VAT in question is incurred on materials used in producing the subject merchandise.

starting prices for EP and CEP effected a commensurate increase in the dumping margins of both

mandatory respondents.

Xugong and Qihang claim that 19 U.S.C. § 1677a(c)(2)(B) does not apply to

irrecoverable VAT.[7]  They argue that Chinese VAT is a domestic tax imposed on certain

materials used in producing OTR tires, not an "export tax, duty, or other charge imposed by the

exporting country on the exportation of the subject merchandise to the United States" within the

intended meaning of the provision.  *See* 19 U.S.C. § 1677a(c)(2)(B).  In the alternative, they

argue that the Department's having calculated irrecoverable VAT as the 8% difference between

the 17% VAT rate and the 9% refund rate is unsupported by record evidence.  *See* Qihang's

Br. 13-15; Xugong's Br. 75-78.  They maintain that because the 17% Chinese VAT is paid on

material inputs, not the value of the exported merchandise, any irrecoverable VAT was not equal

to 8% of the export value of the finished good.

### 1. Commerce Did Not Make a Finding, and the Record Would Not Support a Finding, that Xugong and Qihang Actually Paid Value-Added Tax to the PRC Government upon Exportation of Subject Off-the-Road Tires

Commerce did not state a factual finding that either Xugong or Qihang actually *paid*

value-added tax to the government of China "on the exportation of" subject off-the-road tires to

the United States.  *See* 19 U.S.C. § 1677a(c)(2)(B).  While the Final Issues and Decision

Memorandum contains findings of fact and conclusions of law pertaining to value-added tax, that

---

[7] Qihang did not include this argument in the case brief it submitted during the review and, therefore, did not exhaust its administrative remedies as to it.  *See Qingdao Qihang Tyre Co. Ltd. Case Brief* (Dec. 21, 2015) (P.R. Doc. 321), ECF No. 61-1 ("Qihang's Case Br."). Defendant waived any objection on this ground by not including it in its Rule 56.2 response brief.  *See* USCIT R. 56.2(c).  Moreover, the issue, which was raised during the review by Xugong, is a pure question of law, which has been recognized as an exception to the requirement to exhaust administrative remedies.  *See Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007).

specific factual finding, or one equivalent to it, does not appear in the document.  Commerce

stated that irrecoverable VAT "*amounts to* an export tax, duty, or other charge imposed on

exported merchandise," *Final I&D Mem.* at 22 (emphasis added), and "is a product-specific

export tax, duty, or other charge that is *incurred* on the exportation of subject merchandise," *id.*

at 26 (emphasis added).  The quoted statements are not the equivalent of a finding that VAT

actually was *paid* "on the exportation of" the subject OTR tires.  In response to Xugong's

assertion that under the applicable Chinese VAT regulations the VAT rate on exports is zero,

Commerce answered that

> nowhere in the documents on the record does it say that exporters of OTR tires
> should not be *liable* for VAT upon export of the merchandise, and Xugong does
> not point to a specific exhibit number or page number where this information can
> be found on the record.  To the contrary, the record makes clear that exporters of
> OTR tires will pay 17 percent VAT and be refunded only nine percent (see
> below).

*Final I&D Mem.* at 23 (emphasis added).  In stating its conclusion in this way, Commerce did

not find that Xugong and Qihang actually *paid* VAT "on the exportation of" their subject

merchandise, instead stating that the exporters were "liable" for it.  *Id.*  Nor does the statement

specify the intended meaning of the words "will pay 17 percent VAT."  *Id.*

Were the court to interpret any of the Department's quoted statements to mean that

Commerce found as a fact that the mandatory respondents actually paid VAT "on the exportation

of" their subject merchandise, the statements would conflict with the Department's finding that

exportation of OTR tires resulted in a *refund* of value-added tax, calculated as 9% of the FOB

export value of the tires.  *See id.* at 22-23.  It also would conflict with the Department's finding

that the value-added tax at issue in this case "is VAT paid on inputs and raw materials (used in

the production of exports)."  *Id.* at 23.

Additionally, the record in this case would not have supported a finding that the

value-added tax was paid upon the exportation of the subject merchandise.  The questionnaire

responses of both mandatory respondents constitute record evidence that the VAT incurred by

these respondents resulted from purchases of some of the material inputs used in OTR tire

production.  *See Qingdao Qihang Tyre Co. Ltd. – Section C and Double Remedies Questionnaire

Responses* at 44-50 (Feb. 27, 2015) (P.R. Doc 100); *Xuzhou Xugong Tyres Co., Ltd., ("Xugong")

Section C Questionnaire Response for the Administrative Review of New Pneumatic

Off-The-Road Tires from the People's Republic of China* at 57-59 (Feb. 27, 2015) (P.R.

Doc. 101).

> 2. Commerce Reasoned that VAT Incurred on Material Inputs Used in Domestic Production of a
> Good, But Not Refunded upon Exportation of the Good, "Amounts to" a "Tax, Duty, or Other
> Charge Imposed by the Exporting Government on the Subject Merchandise"

Commerce concluded that under China's VAT regime "some portion of the input VAT

that a company pays on purchases of inputs used in the production of exports is not refunded"

upon the exportation of the finished good.  *Final I&D Mem.* at 22.  As the court noted above,

Commerce reasoned that the portion that is not refunded (to which Commerce referred as

irrecoverable VAT) "amounts to" an "export tax, duty, or other charge imposed by the exporting

country on the exportation of the subject merchandise to the United States" within the meaning

of 19 U.S.C. § 1677a(c)(2)(B).  *Id.* at 23 (". . . irrecoverable VAT, not VAT *per se*, amounts to

an export tax.").  Commerce stated that "[t]he statute does not define the terms 'export tax, duty,

or other charge imposed' on the exportation of subject merchandise," *id.* at 23, and that "[w]e

find it reasonable to interpret these terms as encompassing irrecoverable VAT because the

irrecoverable VAT is a cost imposed by the government that arises as a result of the exportation

of the subject merchandise."  *Id*. at 23-24.  The court considers, therefore, whether it was

reasonable for Commerce to interpret the terms of § 1677a(c)(2)(B) to encompass VAT incurred on materials used in production of OTR tires in China that was not fully refunded upon exportation of the finished tires.  The court concludes that it was not.

    3. The Department's Interpretation of 19 U.S.C. § 1677a(c)(2)(B) Is Impermissible

Defendant argues that the Department's interpretation of 19 U.S.C. § 1677a(c)(2)(B) to apply to Chinese irrecoverable VAT is a reasonable statutory interpretation entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*").  Def.'s Br. 45.  The court disagrees.

As the Supreme Court instructed in *Chevron*, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-843 (footnote omitted). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."  *Id.* at 843 n.9.  "Traditional tools of statutory construction," *id.*, include not only an examination of the statutory text and structure but also consideration of the legislative history.  *See, e.g.*, *Aqua Products, Inc. v. Matal*, 872 F.3d 1290, 1303, 1312-14 (Fed. Cir. 2017) (*en banc*); *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 690 (2018) ("We may find Congress has expressed unambiguous intent by examining the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.") (internal quotations and citations omitted); *Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n*, 844 F.3d 1334, 1338 (Fed. Cir. 2016).  In this case, the "precise question at issue," *Chevron*, 467 U.S. at 842, is whether the words "export tax, duty, or other charge imposed by the exporting country on the exportation of

the subject merchandise to the United States" can be interpreted to describe a value-added tax

incurred on materials used in the production of the merchandise in the foreign country but not

refunded upon the exportation of that merchandise to the United States.

The plain meaning of the statutory language casts doubt on the Department's

interpretation.  The words "*export* tax, duty, or other charge imposed . . . *on the exportation* of

the subject merchandise," as used in § 1677a(c)(2)(B) (emphasis added), would not appear to

describe a value-added tax incurred on materials used in the domestic production of a good, even

if entirely unrefunded upon a later exportation of that good.  At least arguably, a value-added tax

incurred on materials used in production has been "imposed" on something other than

exportation and already has been incurred by the time the exportation of the finished good

occurs.  And although the term "tax, duty, or *other charge*" is broader than the word "tax," the

provision requires that any such "charge" be "imposed . . . *on* the exportation" of the good,

19 U.S.C. § 1677a(c)(2)(B) (emphasis added).  A previously-incurred tax on materials used in

domestic production would not seem to satisfy this requirement.

Additionally, the statutory structure and legislative history of 19 U.S.C. § 1677a(c)(2)(B)

and related provisions in the Tariff Act cause the court to conclude that "Congress had an

intention on the precise question at issue" that "must be given effect."  *Chevron*, 467 U.S.

at 843 n.9.  Congress intended that a domestic tax, such as a value-added tax, imposed by the

foreign country on a good or the materials used to produce that good, would *not* result in a

downward adjustment to EP and CEP starting prices under § 1677a(c)(2)(B).

Section 772(c) of the Tariff Act, 19 U.S.C. § 1677a(c), was enacted in its current form by

the Uruguay Round Agreements Act ("URAA").  *See* Uruguay Round Agreements Act, Pub. L.

No. 103-465, § 223, 108 Stat. 4809, 4876 (1994).  The Statement of Administrative Action (the

"SAA") accompanying the URAA explained that

> New section 772 retains the distinction in existing law between "purchase
> price" (now called "export price") and "exporter[']s sale price" (now called
> "constructed export price"). . . .

* * *

> Under new section 772(c)(1), Commerce will calculate export price and
> constructed export price by adding to the starting prices: (1) packing costs for
> shipment to the United States, if not included in the price; (2) import duties that
> are rebated or not collected due to the exportation of the merchandise (duty
> drawback); and (3) countervailing duties attributable to export subsidies.  Section
> 772(c)(2) requires that Commerce reduce export price to account for:
> (1) transportation and other expenses, including warehousing expenses, incurred
> in bringing the subject merchandise from the original place of shipment in the
> exporting country to the place of delivery in the United States; and (2) if included
> in the price, export taxes or other charges imposed by the exporting country.
> *These adjustments have not changed from current law.*

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R.

Rep. No. 103–316, Vol. 1 at 822-23 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163

(emphasis added) ("*SAA*").  The reference to "current law" clarifies that the downward

adjustment to EP and CEP for "export taxes or other charges" (the "export tax" adjustment)

under the new statute was intended to be the same downward adjustment as the downward

adjustment to purchase price and exporter's sale price (identified collectively in the statute as

"United States price") as was made under the prior statute.  That is, the only change to the export

tax adjustment Congress intended to make in enacting the URAA was the change to the new

terminology used to describe what was being adjusted.

The statutory language specifying the adjustment for export taxes, duties, and other

charges, i.e., the "export tax" adjustment, was not materially changed by the URAA.  Consistent

with the explanation in the SAA that no change was intended in this adjustment, Congress

retained in the post-URAA section 772(c)(2)(B) the provision accomplishing the adjustment that

was nearly identical to that of section 772(d)(2)(B), as codified by the Trade Agreements Act of

1979 ("TAA"), the antecedent provision.  Trade Agreements Act of 1979, Pub. L. No. 96-39, §

101, 93 Stat. 144, 182 (1979).  Therefore, the court must decide if Congress had an intention on

whether the TAA export tax adjustment would apply to materials used in the production of a

good in a foreign country that was not remitted or avoided by reason of exportation of the

finished good.  The court concludes that Congress intended that it would not.

Just prior to enactment of the URAA in 1994, section 772, in all respects relevant to the

issue presented here, was unchanged from the form in which it was enacted as part of the TAA.

Significant to this discussion is that the 1979 statute included not only the export tax adjustment,

which if applied would increase a dumping margin, but then also included an *upward* adjustment

to purchase price and exporter's sales price, i.e., an adjustment that would *reduce* a dumping

margin, that applied to recoverable value-added taxes.  The two foreign-tax-related provisions

that appeared in the TAA version of the statute are as follows:

The purchase price and the exporter's sales price shall be adjusted by being—

(1)      increased by—

* * *

    (C) the amount of any taxes imposed in the country of exportation directly
upon the exported merchandise or components thereof, which have been rebated,
or which have not been collected, by reason of the exportation of the merchandise
to the United States, but only to the extent that such taxes are added to or included
in the price of such or similar merchandise when sold in the country of
exportation . . .

* * *

and

* * *

(2)      reduced by—

* * *

   (B) the amount, if included in such price, of any export tax, duty, or other
charge imposed by the country of exportation on the exportation of the
merchandise to the United States other than an export tax, duty, or other charge
described in section 1677(6)(C) of this title.

19 U.S.C. § 1677a(d) (1982).  A comparison of the language Congress used in the two provisions

demonstrates an intent to address different classes of taxes in each.  In § 1677a(d)(1)(C),

Congress addressed a tax "imposed *in* the country of exportation directly *upon* the exported

merchandise" or the components used to produce it.  19 U.S.C. § 1677a(d)(1)(C) (1982)

(emphasis added).  This language plainly describes a domestic tax such as a VAT.  Any amount

of such tax that was refunded, or not collected, by reason of exportation to the United States

would reduce a dumping margin if it was reflected in prices of home-market sales of identical or

similar merchandise.  Consistent with its plain meaning, the provision generally was understood

to refer to recoverable VAT imposed by the country of exportation.  *See Federal-Mogul Corp. v.

United States*, 63 F.3d 1572 (Fed. Cir. 1995).

   In contrast, Congress provided in § 1677a(d)(2)(B) (1982) (and currently in

§ 1677a(c)(2)(B)) that a tax, duty, or other charge in the home-market country imposed *on the

exportation* of the merchandise to the United States, if included in the price of the merchandise,

would *increase* a dumping margin (unless intended to offset a countervailable subsidy).  The

provision does not refer to domestic taxes imposed on the merchandise itself, and there is no

mention of a tax imposed on components of that merchandise, as there was in § 1677a(d)(1)(C).

   Because of the different language Congress used in the two provisions, any attempt to

interpret § 1677a(d)(2)(B) to address irrecoverable VAT poses an insurmountable problem.  The

differences in the two provisions of the TAA demonstrate congressional awareness of a

distinction between domestic taxes, such as value-added taxes, that are imposed directly *on*

finished goods or the components thereof (which had the potential to result in an adjustment that

reduces a dumping margin), and taxes imposed *on the exportation* of finished, exported goods

(which had the potential to result in an adjustment that increases a dumping margin).  While

specifying in § 1677a(d)(1)(C) that a dumping margin would be reduced for a domestic tax, such

as a VAT, if it was recovered (or not collected) by reason of exportation and appeared in the

price of the foreign like product, Congress did not provide for a margin adjustment, downward or

upward, for *irrecoverable* VAT.  Congress having addressed taxes such as value-added taxes in

subparagraph (1)(C) of § 1677a(d), it would be unreasonable, and illogical, to conclude that

Congress also intended to address these same types of taxes in subparagraph (2)(B), in which it

used language that was different and unsuitable for that purpose.  Congress plainly was aware

that a foreign government might impose a domestic tax on materials used in producing a good

that is later exported to the United States and also aware that such a tax might be, or might not

be, recovered or not collected by reason of the exportation of the good made from those

materials.  The plain meaning of the two provisions, when read together, demonstrates

congressional intent *not* to increase a dumping margin for VAT, whether or not recoverable upon

exportation of the finished good.  In sum, the 1979 TAA reduced a dumping margin for

*recoverable* VAT that was present in home-market prices, increased a dumping margin for taxes,

duties, and other charges imposed on the exportation of the finished good to the United States, if

appearing in the purchase price or exporter's sale price (unless imposed to adjust for a

countervailable subsidy), and made no margin adjustment at all for *irrecoverable* VAT.

While imposing the same adjustment to United States price (now EP and CEP) for export

taxes as did the TAA, the URAA converted the § 1677a(d)(1)(C) upward adjustment to United

States price to a downward adjustment to normal value, where it also would reduce a dumping

margin.  A side-by-side comparison of the TAA and URAA provisions illustrates the change.  As

noted above, the TAA increased United States price (and thereby reduced dumping margins) by:

> the amount of any taxes imposed in the country of exportation directly upon the
> exported merchandise or components thereof, which have been rebated, or which
> have not been collected, by reason of the exportation of the merchandise to the
> United States, but only to the extent that such taxes are added to or included in the
> price of such or similar merchandise when sold in the country of exportation . . . .

19 U.S.C. § 1677a(d)(1)(C) (1982).  As amended by the URAA, the antidumping statute reduces

the price by which normal value is determined (and thereby reduces dumping margins) by

> the amount of any taxes imposed directly upon the foreign like product or
> components thereof which have been rebated, or which have not been collected,
> on the subject merchandise, but only to the extent that such taxes are added to or
> included in the price of the foreign like product . . . .

19 U.S.C. § 1677b(a)(6)(B)(iii).  This provision has remained in the antidumping law since the

1994 enactment of the URAA and is unchanged in the current statute.

The SAA discussed the change from the TAA version to the URAA version as follows:

> The deduction from normal value for indirect taxes constitutes a change
> from the existing statute.  The change is intended to ensure that dumping margins
> will be tax-neutral.  The requirement that the home-market consumption taxes in
> question be "added to or included in the price" of the foreign like product is
> intended to insure that such taxes actually have been charged and paid on the
> home market sales used to calculate normal value, rather than charged on sales of
> such merchandise in the home market generally.  It would be inappropriate to
> reduce a foreign price by the amount of the tax, unless a tax liability had actually
> been incurred on that sale.

*SAA* at 827-28, *reprinted in* 1994 U.S.C.C.A.N. at 4166.

In *Federal-Mogul Corp.*, 63 F.3d at 1575-76, which was decided after enactment of the

URAA but on a factual situation arising under the prior TAA provisions, the Court of Appeals

noted that Commerce had a practice under the TAA of addressing recoverable VAT by making a

downward adjustment to normal value rather than an upward adjustment to U.S. price.  The

Court of Appeals affirmed this practice, noting that doing so corrects a mathematical problem

that understated the downward margin adjustment, from the standpoint of achieving tax

neutrality, when the adjustment is made to U.S. price.  *Id.* at 1580-82.  The URAA made a

statutory change analogous to the Department's practice under the prior statute.

The principle that dumping margins should be "tax-neutral," which is noted in the SAA

excerpt quoted above and in *Federal-Mogul*, *id.*, serves to explain the adjustments in the URAA

and those in the TAA as well.  Unless a downward margin adjustment is made, home-market

taxes such as a VAT, if present in the price of the foreign like product but, due to recovery upon

exportation, not present in the U.S. price (i.e., the purchase price or the exporter's sales price

under the TAA, and the export price or constructed export price under the URAA), improperly

inflate a dumping margin.  To obtain a tax-neutral price comparison, the margin-inflating effect

of a recoverable domestic tax is removed from the margin calculation, either by adding it to the

U.S. price (under the previous law) or by removing it from the home-market price (under the

current statute).  On the other hand, an "export" tax, i.e., an export tax, duty, or other charge that

is incurred upon the exportation of the merchandise, is by definition one that is not present in the

home-market price of the foreign like product.  Congress intended that such a tax, if present in

the U.S. price, should be removed from U.S. price to achieve a tax-neutral price comparison

between normal value (when based on the home-market price or other comparison-market price)

and U.S. price, unless imposed to offset a countervailable subsidy.  In summary, Congress

provided, in both the TAA and the URAA, a statutory scheme under which home-market taxes

that are recoverable upon exportation, such as recoverable VAT, the adjustment for which would

reduce a dumping margin, are treated one way and export taxes, the adjustment for which would increase a dumping margin, are treated the opposite way.

It can now readily be seen that the Department's interpretation of the current § 1677a(c)(2)(B) to require a margin increase for irrecoverable VAT, which is not supported by the plain meaning of the provision, also conflicts with the legislative purpose. A foreign exporter of a product upon which VAT, a domestic tax, was imposed (either on the product itself or components therein) will receive a reduction in the dumping margin to the extent the VAT appears in the home-market price but does not appear in the U.S. price that is compared to that price, i.e., to the extent the VAT is refunded or not collected as a result of exportation ("recoverable" VAT). The downward adjustment to the margin (whether effected by an upward adjustment to U.S. price, as under former law, or a downward adjustment to normal value, as under current law) restores the balance to tax-neutrality. On the other hand, Congress intended that VAT that appears in both the home-market price and also in the U.S. price, because it is irrecoverable upon export, would result in neither an upward nor a downward adjustment to the dumping margin. Having incurred it, the foreign producer or exporter can be expected to pass it on by including it in the U.S. price, and there is no justification for removing this domestic tax from the U.S. price. Because the irrecoverable VAT is present in the home-market price of the foreign like product and also in the U.S. price, the comparison is already tax-neutral, and no adjustment to the dumping margin is required or appropriate.[8] The producer or exporter already

---

[8] Commerce reasoned that Chinese irrecoverable VAT "amounts to an export tax, duty, or other charge imposed on exported merchandise *that is not imposed on domestic sales.*" *Final I&D Mem.* at 22 (emphasis added). It was logical for Commerce to conclude that VAT that becomes irrecoverable upon exportation is not "imposed" on domestic sales: in a domestic sale of the finished good, no exportation occurs, as a matter of definition. Commerce did *not* find as (continued . . .)

lost the benefit of any downward adjustment to the margin to the extent the VAT was not

recovered, in that the downward adjustment to normal value (as was the previous upward

adjustment to U.S. price) is limited to recoverable VAT.  This stands in contrast to an export tax,

which may be present in the U.S. price but, by definition, cannot be present in the home-market

price.  This is because, as the URAA recognized in 19 U.S.C. § 1677a(c)(2)(B) (which is

continued in current law) and the TAA recognized in 19 U.S.C. § 1677a(d)(2)(B) (1982), an

export tax, duty, or other charge under the "export tax" provision is limited to one that is

"imposed by the exporting country on the *exportation* of the subject merchandise to the United

States."  19 U.S.C. § 1677a(c)(2)(B) (emphasis added); *see* 19 U.S.C. § 1677a(d)(2)(B) (1982)

("imposed by the country of exportation *on the exportation* of the merchandise to the United

States") (emphasis added).  The Department's construction of 19 U.S.C. § 1677a(c)(2)(B) to

increase a dumping margin for irrecoverable VAT does not achieve tax neutrality but upsets the

balance the statute is intended to achieve, impermissibly inflating a dumping margin by the

amount of the irrecoverable VAT.

To summarize, because irrecoverable VAT would be present in both the price of the

foreign like product and the U.S. price, no adjustment to the margin is necessary to achieve tax

neutrality.  Making an adjustment under these circumstances by reducing the starting price for

EP or CEP by the amount of the irrecoverable VAT would be "double-counting" the effect of the

irrecoverable VAT, inflating the dumping margin accordingly.

Up to this point, the court's analysis considered comparisons between U.S. price and

normal value that is based on price, either in the home market or another comparison market.

---

(. . . continued)
a fact that Chinese domestic sales of OTR tires do not incur VAT (which, presumably, would
defeat the purpose of a VAT), and the record in this case would not permit such a finding.

The court now considers this issue in the context of situations in which normal value is not based on price.  Normal value may be based on constructed value (under 19 U.S.C. § 1677b(e)) and, in the special case of goods produced in a non-market economy country, ordinarily is based on valuation of factors of production according to the best available information in a market economy country Commerce considers appropriate (under 19 U.S.C. § 1677b(c)).  In the case of constructed value, the Tariff Act includes a provision to ensure that the cost of materials used in producing the subject imported merchandise do not include a recoverable internal tax such as a VAT.  Under this provision, "the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials." 19 U.S.C. § 1677b(e).  The use of the term "internal tax" distinguishes the provision from the export tax adjustment, which applies only to external taxes imposed on exportation.  No provision parallel to § 1677b(e) is in § 1677b(c), which addresses normal value for non-market economy countries based on surrogate values for factors of production.  This omission is logical because the prices for the materials in the home-market, non-market economy country ordinarily are not used in calculating normal value under that provision.  But here also, the objective of tax neutrality is still relevant, as Commerce implicitly recognizes in preferring surrogate values that are exclusive of taxes.  *See, e.g.*, *Final I&D Mem.* at 51.

Commerce explained in the review that previously it did not adjust EP and CEP starting prices for Chinese irrecoverable VAT but that "[i]n 2012, we announced a change of methodology with respect to the calculation of the EP or CEP to include an adjustment for irrecoverable VAT in certain NME [non-market economy] countries, in accordance with section 772(c)(2)(B) of the Act." *Final I&D Mem.* at 22 (citing *Methodological Change for*

*Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain*

*Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36,481, 36,482 (Int'l Trade

Admin. June 19, 2012) ("*Methodological Change*")).  In *Methodological Change*, Commerce

explained that its administrative practice had been not to make the adjustment to EP and CEP

starting prices under 19 U.S.C. § 1677a(c)(2)(B) when the good was exported from a non-market

economy country "because pervasive government intervention in NMEs precluded proper

valuation of taxes paid by NME respondents to NME governments."  *Methodological Change*,

77 Fed. Reg. at 36,482.  In the notice, Commerce concluded that for certain non-market economy

countries, specifically China and Vietnam, under its countervailing duty practice it now believed

it could "determine whether the Chinese or Vietnamese governments have bestowed an

identifiable and measurable benefit upon a producer, and whether the benefit is specific,

including certain measures related to taxation."  *Id.*  On that reasoning, Commerce announced

that for antidumping investigations and reviews of merchandise from China and Vietnam "the

Department will determine whether, as a matter of law, regulation, or other official action, the

NME government has imposed 'an export tax, duty, or other charge' upon export of the subject

merchandise during the period of investigation or the period of review (*e.g.*, an export tax or

VAT that is not fully refunded upon exportation)."  *Id.*  As applied to an internal tax such as a

VAT, this reasoning was contrary to the congressional intent underlying 19 U.S.C.

§ 1677a(c)(2)(B).

        Rather than take account of the differences between an export tax and an internal tax such

as a VAT imposed domestically on materials used in production in the country of exportation,

*Methodological Change* treats all irrecoverable VAT in a non-market economy country as the

equivalent of an export tax for purposes of 19 U.S.C. § 1677a(c)(2)(B).  This is erroneous for the

reasons the court discussed previously: Congress drew a clear distinction between the export tax

adjustment, which it addressed in § 1677a(c)(2)(B), and VAT imposed domestically in the

country of production, on the good or the materials used to make it, which it addressed in the

normal value provisions of the statute.  Congress was familiar with the concept of irrecoverable

VAT and addressed it by enacting provisions under which irrecoverable VAT would neither

increase nor decrease a dumping margin.  In carefully crafting § 1677a(c)(2)(B) to apply only to

export taxes and other charges imposed upon exportation of the good, and not to internal taxes

imposed by the country of exportation (whether or not recoverable upon export), Congress made

no exception for the determination of EP or CEP for goods exported from non-market economy

countries.  To the contrary, while such countries are treated differently as to the determination of

normal value, *see* 19 U.S.C. § 1677b(c), they are not treated differently as to the determination of

U.S. price (EP or CEP), *see* 19 U.S.C. § 1677a.  It is noteworthy that the non-market economy

provisions of 19 U.S.C. § 1677b(c) predated the URAA, having been enacted as part of the

Omnibus Trade and Competitiveness Act of 1988, replacing the more limited provisions relating

to state-controlled economies.  *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L.

No. 100-418, § 1316(a), 102 Stat. 1107, 1186-87 (1988).  The 1988 amendments did not make

changes to § 1677a(d)(2)(B), which addressed export taxes.

From the time of the 1988 amendments to the present, there has been no indication that

Congress intended for value-added taxes imposed by non-market economy countries to be

treated differently under 19 U.S.C. § 1677a(d)(2)(B) (1982) (now § 1677a(c)(2)(B)) than those

imposed by market economy countries.  The reasoning Commerce put forth in *Methodological*

*Change*, which applies only to certain non-market economy countries, is based on a contrary,

and invalid, assumption.  Broadly stated, normal value is the value at which a good *should be*

sold in the U.S. market in order to be considered to be fairly traded under the antidumping duty laws.  U.S. price (EP or CEP) is the adjusted price at which the good *is* sold in the U.S. market. Unlike the method of determining the former, the method of determining the latter does not change in the special situation in which the good is exported from a non-market economy country.  *Compare* 19 U.S.C. § 1677a, *with* 19 U.S.C. § 1677b.  Under the correct implementation of the statute, irrecoverable VAT does not result in an increase or a decrease in a dumping margin, regardless of whether the exporting country is a market economy country or a non-market economy country.

In the Final Issues and Decision Memorandum, Commerce attempts to distinguish China from other countries with respect to VAT.  Commerce compared the Chinese VAT system with what it called a "typical VAT system," according to which producers "receive on export a full rebate of the VAT which they pay on purchases of inputs used in the production of exports ('input VAT'), and, in the case of domestic sales, the company can credit the VAT they pay on input purchases for those sales against the VAT they collect from customers." *Final I&D Mem.* at 22 (footnote omitted).  According to Commerce, "[t]hat stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded." *Id.* (footnote omitted).  Under the Department's flawed reasoning, Chinese irrecoverable VAT is within the scope of 19 U.S.C. § 1677a(c)(2)(B) simply because it is irrecoverable.  Were this reasoning sound, any VAT not recovered or avoided by reason of exportation of the finished good, regardless of the country of exportation, would have to be treated the same way, i.e., to increase a dumping margin.  As the history and purpose of the statute demonstrate, that is not what Congress intended.

Because the Department's interpretation of 19 U.S.C. § 1677a(c)(2)(B) to allow it to

deduct irrecoverable VAT from EP or CEP starting prices is not supported by plain meaning and

is contrary to congressional intent, it must be set aside according to *Chevron* Step One.

Defendant cites decisions in which this Court concluded that the Department's interpretation is a

reasonable one, Def.'s Br. 46-49, and the court notes that other decisions of this Court also have

reached that conclusion.  In these prior decisions, the issue of whether the Department's

interpretation was consistent with statutory history and legislative purpose, and with legislative

history as shown in the SAA, does not appear to have been argued, as that issue is not addressed

in the various opinions.  *See Diamond Sawblades Mfrs.' Coal. v. United States*, 42 CIT __, __,

Slip Op. 18-28 at *4-12 (Mar. 22, 2018); *Aristocraft of Am., LLC v. United States*, 41 CIT __, __,

269 F. Supp. 3d 1316, 1321-26 (2017); *Jacobi Carbons AB v. United States*, 41 CIT __, __,

222 F. Supp. 3d 1159, 1186-88 (2017); *Juancheng Kangtai Chem. Co. v. United States*, 41 CIT

__, __, Slip Op. 17-3 at *25-31 (Jan. 19, 2017); *Fushun Jinly Petrochemical Carbon Co. v.

United States*, 40 CIT __, __, Slip Op. 16-25 at *20-25 (Mar. 23, 2016).[9]  The court now

concludes that the statutory history and legislative purpose demonstrate that the Department's

interpretation cannot be a reasonable one.

In conclusion, Commerce has made downward adjustments to the EP and CEP starting

prices for subject merchandise exported by Xugong and Qihang based on an impermissible

construction of 19 U.S.C. § 1677a(c)(2)(B).  Congress did not intend for such deductions to

---

[9] In another decision, *China Manufacturers Alliance, LLC v. United States*, 41 CIT __, __, 205 F. Supp. 3d 1325, 1344-51 (2017), this Court did not reach the statutory construction issue decided in this case because Commerce did not state a valid finding, grounded in record evidence, that the plaintiff had incurred any irrecoverable VAT, substituting instead a presumption that the plaintiff had incurred irrecoverable VAT equal to 8% of the value of the exported merchandise.

occur.  Commerce must correct this error in responding to the court's order in this proceeding.

The court, therefore, has no occasion to consider the claims in the alternative of Xugong and

Qihang that Commerce erroneously determined the amounts of irrecoverable VAT.

### D. Claims Challenging Surrogate Values

In proceedings, including reviews, of antidumping duty orders on merchandise from

non-market economy countries such as China, Commerce ordinarily determines the normal value

of the subject merchandise according to the procedures of section 773(c)(1) of the Tariff Act,

19 U.S.C. § 1677b(c)(1).  Under these procedures, Commerce determines normal value "on the

basis of the value of the factors of production utilized in producing the merchandise" plus "an

amount for general expenses and profit plus the cost of containers, coverings, and other

expenses."  *Id.* § 1677b(c)(1).  The factors of production include, but are not limited to, the

"hours of labor required," the "quantities of raw materials employed," "amounts of energy and

other utilities consumed," and "representative capital cost, including depreciation."  *Id.*

§ 1677b(c)(3).  Commerce is directed generally to base the values of factors of production "on

the best available information regarding the values of such factors in a market economy country

or countries considered to be appropriate."  *Id.* § 1677b(c)(1).  Commerce is further directed to

value factors of production using information from one or more market economy countries that

are "at a level of economic development comparable to that of the nonmarket economy country"

and "significant producers of comparable merchandise."  *Id.* § 1677b(c)(4).

In contesting the Final Results, Xugong and Qihang challenge specifically the surrogate

value for reclaimed rubber, a raw material that both used in tire production.  *See* Xugong's

Br. 23-38; Qihang's Br. 33-54.  They also challenge the method Commerce used to calculate a

surrogate value for one of the expenses Commerce included in the normal value calculation,

which was "foreign inland freight." *See* Xugong's Br. 38-44; Qihang's Br. 15-33.

### 1. Surrogate Value for Reclaimed Rubber

"Reclaimed rubber" is a product obtained by processing rubber products into a form that

can be used as a material in the manufacturing of new rubber products, such as tires.  Xugong

and Qihang challenge as unreasonable and aberrational the surrogate value Commerce calculated

for this factor of production, which was an average unit value ("AUV") of $2.49 per kilogram,

using Global Trade Atlas ("GTA") import data from Thailand on reclaimed rubber.  *Final I&D*

*Mem.* at 53-57.  They argue that the AUV obtained from the Thai GTA import data was

aberrational when compared to other record data and that it also was aberrational because it was

higher than the surrogate values Commerce applied to natural rubber.  According to Xugong and

Qihang, the historical record data demonstrate that reclaimed rubber prices over the last thirty

years always have been lower than the prices for natural rubber.  Both argue that Commerce

should have used, as the best available information, an AUV obtained from GTA data on

Peruvian imports of reclaimed rubber, which was $0.53 per kilogram, and which was lower than

the AUV shown in the Peruvian data for natural rubber.  *See Provision of Initial Surrogate*

*Values by Xuzhou Xugong Tyres Co. Ltd.* at Ex. 7 (Mar. 19, 2015) (P.R. Docs. 128-32) ("*Xugong*

*Initial SV Submission*").

The record contained GTA import data on reclaimed rubber from countries Commerce

considered to be economically comparable to China that allowed Commerce to determine per-

kilogram AUVs, based on quantities, as follows: Peru ($0.53, based on 1,102,938 kg.), Belarus

($0.73, based on 1,479,490 kg.), Bulgaria ($0.79, based on 367,000 kg.), Serbia ($0.82, based on

306,485 kg.), Ukraine ($0.90, based on 93,521 kg.), Ecuador ($0.99, based on 170,346 kg.),

Romania ($1.07, based on 3,967,111 kg.), South Africa ($1.34, based on 312,374 kg.),

Montenegro ($1.41, based on 839 kg.), Colombia ($1.84, based on 16,002 kg.), Algeria ($2.21,

based on 58,157 kg.), Thailand ($2.49, based on 205,384 kg.), Jordan ($12.94, based on 249 kg.),

and Paraguay ($19.57, based on 53 kg.).  *See* Qihang's Br. 43.  Commerce viewed the AUVs for

Jordan and Paraguay as "truly aberrational" and excluded them from consideration.  *Final*

*Results of the 2013-2014 Administrative Review of the Antidumping Duty Order on Certain New*

*Pneumatic off-The-Road Tires from the People's Republic of China: Surrogate Value*

*Memorandum* 6 (Apr. 12, 2016) (P.R. Doc. 336) ("*Final Surrogate Value Mem.*").  The small

quantities on which the AUVs for Jordan and Paraguay were based (249 kg. and 53 kg.,

respectively) would appear to make these AUVs unsuitable for use as surrogate values for this

reason as well.

Commerce concluded that the surrogate value based on the Thai GTA data was not

aberrational, giving several reasons.  Commerce recognized that the Thai AUV was

approximately two-and-one-half times as large as the median value obtained from most of the

other potential surrogate countries on the list prepared by its Office of Policy but stated that "we

do not find this price difference to be so substantial as to call into question the validity of the

Thai value or constitute evidence of aberrationality."  *Final I&D Mem.* at 55-56 (footnote

omitted).  It also found that the quantity of imports represented by the Thai reclaimed rubber

value of $2.49, which was 205,384 kg., was "a commercially viable quantity which is not

distortive."  *Id.* at 56-57.

Commerce also addressed the issue of whether the Thai-based value of $2.49 per

kilogram was aberrational because it was higher than the Thai-based values for natural rubber,

($2.01 per kilogram for technically-specified natural rubber and $2.28 per kilogram for ribbed

smoked sheets).  Commerce concluded it was not, citing record data showing that "the price of

natural rubber has dropped by 32-33 percent over the POR itself, and more so over the years

before" and that "the value of reclaimed rubber, in comparison, has risen over the past years,

138 percent since 2009, and this rise has been at a generally steady increase." *Final I&D Mem.*

at 56 (footnotes omitted).  Commerce concluded that "[w]ith such a significant decrease in price

for natural rubber in the POR, that natural rubber may fall below the cost of the consistently

steadily increasing reclaimed rubber does not signal that the reclaimed rubber value is

aberrational or unusual." *Id.*

The Department's conclusion that the surrogate value of $2.49 per kilogram for

reclaimed rubber is not aberrational lacks the support of substantial evidence on the record.  The

record includes data on the historical relationship between the price of natural rubber and that of

reclaimed rubber, which is in the form of a table Commerce included in its final surrogate value

memorandum ("Chart C: Historical Price of Natural Rubber vs. Reclaimed Rubber").  *See Final*

*Surrogate Value Mem.* at 10.  The table shows that over the 30 years between 1983 and 2013, the

price for reclaimed rubber consistently has been lower than the price of natural rubber and, as a

general matter, much lower.  *Id.*  The chart shows that despite the rise in the value of reclaimed

rubber and the fall in the price of natural rubber over the last several years that are shown in the

table, the price of natural rubber, as of 2013 (the last year shown in the table), still was

approximately 180% higher than the price of reclaimed rubber.  *Id.*  Commerce relied on the

movement in the prices of both commodities to conclude that the value of reclaimed rubber

could be higher than the value of natural rubber, but this conclusion is refuted by the record

evidence in the 30-year table.  Also, record evidence that reclaimed rubber is used in production

of off-the-road tires instead of natural rubber because of its cost advantage is not rebutted by

other record evidence.  And as Commerce itself acknowledged, the Thai AUV for reclaimed rubber was approximately two-and-one-half times the median value for this product obtained from import data from most of the other potential surrogate countries.  Because the Department's finding that its surrogate value for reclaimed rubber is not aberrational is unsupported by the record evidence considered as a whole, Commerce cannot be said to have reached a valid finding that it valued reclaimed rubber according to the "best available information" as required by 19 U.S.C. § 1677b(c)(1).  Commerce must reconsider that value and reach a new determination based on findings supported by substantial evidence on the record.

### 2. Surrogate Value for Foreign Inland Freight

Xugong and Qihang claim that the surrogate value Commerce applied to foreign inland freight in China, which was based on data for Thailand, was not supported by substantial record evidence.  *See* Xugong's Br. 38-44; Qihang's Br. 15-33.  Commerce used the Thai data to calculate a surrogate freight rate of $0.0015 per kilogram, per kilometer.  *Final Surrogate Value Mem.* at Attch. I.  Xugong and Qihang challenge the method by which the surrogate value was calculated.  In the alternative, they argue that Commerce should have used record data other than the data Commerce used in determining the surrogate value.

In calculating normal value according to 19 U.S.C. § 1677b(c), Commerce adds to the price of material inputs a surrogate cost for the expense incurred for inland transportation of the materials, i.e., truck freight, to the point of production.  It also deducts from U.S. price (EP or CEP) a surrogate cost for the expense of transporting finished goods to the port of exportation.  To calculate a surrogate value for this "foreign inland freight" in the sixth review, Commerce used a World Bank report entitled *Doing Business 2015: Thailand*, which estimated at $210 the cost of transporting products in a standard 20-foot shipping container weighing 10 metric tons

from the largest city in Thailand, i.e., Bangkok, to the nearest seaport.  *See Petitioners' First Surrogate Value Submission* at Ex. 9 (Mar. 19, 2015) (P.R. Docs. 138-39).  The 2015 Doing Business report did not present information on the actual distance goods would have to travel to reach a seaport.  *Id.*  Therefore, to use the information in the 2015 report in calculating a per-kilogram, per-kilometer surrogate cost for foreign inland freight, Commerce estimated the average distance from 26 industrial districts in Bangkok to the nearest seaport, for use as the denominator in the calculation.  *Final I&D Mem.* at 57-62.  The distance Commerce used, both for the Preliminary Results and the Final Results, was 13.87 kilometers.  *Id.* at 60.  Using this average distance, Commerce calculated its surrogate freight rate of $0.0015 per kilogram, per kilometer.  *Final Surrogate Value Mem.* at Attch. I.  Xugong and Qihang view this distance as unreasonably low (causing the rate derived therefrom to be excessively high) and unsupported by the record data.  The 13.87 kilometer estimate was derived from information in a table listing various locations in Bangkok, submitted to the record by the petitioner.  *See Petitioners' Second Surrogate Value Submission* at Attch. 8 (Aug. 31, 2015) (P.R. Docs. 253-54).  The source of the table was a "Bangkok Post" document describing various "districts" of Bangkok, located within "clusters."  *Id.*

In addition to freight-cost information relating to Thailand, the record contained information relating to freight costs in Indonesia, submitted by Qihang, *see Qingdao Qihang Tyre Co. Ltd. – Initial Surrogate Value Submission* at Ex. SV-24 (Mar. 19, 2015) (P.R. Docs. 121-26), and information relating to freight costs in Peru, which Xugong submitted, *see Xugong Initial SV Submission* at Ex. 8.  In the Final Issues and Decision Memorandum, Commerce did not discuss the information relating to freight costs in Indonesia and Peru, confining its discussion to the record data pertaining to Thailand.  *Final I&D Mem.* at 57-62.

Specifically, Commerce directed most of the discussion to the choice of data from which it could

estimate an average distance from industrial locations in Thailand to the nearest port.  Commerce

concluded that the record was sufficiently developed to support consideration of only three

"usable" distances in Thailand: the 13.87 kilometer average distance, a second calculated

distance of 8.3 kilometers, which was the distance from downtown Bangkok to the port of

Bangkok as determined in the Department's investigation of Certain Passenger Vehicle and

Light Truck Tires from China that also used the 2015 Doing Business in Thailand report, and a

distance of 9.51 kilometers, which was developed "from a list of the distances to the Port of

Bangkok from all Thai companies that provided information for *Doing Business in Thailand*

*2015* for which the World Bank provided an address."  *Final I&D Mem.* at 61.  Commerce

concluded that "given the paucity of information on the record supporting distances higher than

13.87 km, the Department has determined to use the same distance from the *Preliminary Results*

in the final results in its calculation of inland freight for these final results."  *Id.* at 62.

Xugong and Qihang raise various objections to the Department's surrogate freight rate.

Qihang objects that Commerce, in past proceedings, inconsistently has used various distances

that the freight would travel in Thailand, most of which are much greater than 13.87 kilometers,

Qihang's Br. 19-22, and should have considered the information in the Department's possession

from past proceedings in determining the reasonableness of its determination, *id.* at 26.  Qihang

also argues that in past cases Commerce has used distances to two Thailand ports, the ports of

Bangkok and Laem Chabang, rather than only the port of Bangkok.  *Id.* at 22-23.  Qihang further

contends that, if the record did not contain sufficient data, Commerce should have taken "steps to

develop the record further to satisfy its statutory obligation to support its decision through

substantial record evidence."  Qihang's Br. 23; *see Final I&D Mem.* at 61 ("Parties did not

provide significant comments or rebuttal distance information during the period of time made available for surrogate value information.").  Additionally, Qihang points out that despite its "suggesting that it was a superior source, Commerce failed to even acknowledge the data on the record with respect to the Peruvian truck price quote and distance map submitted by Xugong." *Id.* at 27.  Finally, Qihang argues that the Department unreasonably rejected Qihang's attempt to supplement the record with a more recent report, *Doing Business 2016: Thailand*, which contained freight distance information.  *Id.* at 27-33.

Xugong argues that the Department's calculation of 13.87 kilometers as the distance from industrial locations in Bangkok to the nearest port was unsupported by substantial evidence because "there is no record support for petitioners' assertion that the 26 districts selected by petitioners are in fact 'industrial' districts."  Xugong's Br. 40.  Xugong also argues that "[w]ith respect to which country's data contains the 'best available domestic inland freight data,' Commerce in fact has conducted no record analysis whatsoever concerning the Peruvian freight data."[10]  Xugong's Br. 21.

---

[10] This argument is not precluded by the requirement to exhaust administrative remedies, *see* 28 U.S.C. § 2637(d)—despite the fact that Xugong did not make this argument in its case brief—because Qihang's case brief presented the argument.  *See Qingdao Qihang Tyre Co. Ltd. – Revised Administrative Case Brief* at 14 (Dec. 21, 2015) (P.R. Doc. 321) (arguing that "the record evidence on inland freight costs from Peru does not pose the problems that exist with respect to the Thai data.").  Considering the merits of Xugong's argument does not offend "the general policies underlying the exhaustion requirement," namely "protecting administrative agency authority and promoting judicial efficiency."  *Corus Staal BV v. United States*, 502 F.3d 1370, 1379–80 (Fed. Cir. 2007) (citations and quotations omitted).  The exhaustion doctrine "acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."  *Id.* at 1380 (citations and quotations omitted).  Because Qihang made the argument in its case brief, the Department had the opportunity to consider it during the administrative proceeding.

Without ruling on the parties' other arguments, the court finds that on this final point Xugong is correct. Despite Qihang's argument in its case brief that "the record evidence on inland freight costs from Peru does not pose the problems that exist with respect to the Thai data," *see Qingdao Qihang Tyre Co. Ltd. – Revised Administrative Case Brief* at 14 (Dec. 21, 2015) (P.R. Doc. 321) ("*Qihang's Case Br.*"), Commerce, in the Final Issues and Decision Memorandum, did not address the issue of whether the inland freight data from Peru could constitute the best available information on the record. *See Final I&D Mem.* at 57-62. Defendant concedes that Commerce did not address Qihang's argument. *See Def.'s Br. 41.* Citing 19 C.F.R. § 351.408(c)(2), defendant argues that because "Commerce determined it had usable and reliable data" from its primary surrogate country, i.e., Thailand, "Commerce reasonably determined that it was unnecessary to weigh the relative merits of the Peruvian data." *Id.* The court does not agree with the Department's conclusion that it did not need to weigh the Peruvian inland freight data that were on the record. Commerce was obligated to consider Qihang's argument that the inland freight data from Peru were better than the competing data from Thailand. *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) ("Commerce also has an 'obligation' to address important factors raised by comments from petitioners and respondents." (citations omitted)).

On this record, which contained alternate information that could be used in calculating a surrogate value, Commerce was obligated to determine what information constituted the "best available information." 19 U.S.C. § 1677b(c)(1). The regulation upon which defendant relies, 19 C.F.R. § 351.408(c)(2), does not compel a conclusion to the contrary. The regulation provides that "the Secretary *normally* will value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2) (emphasis added). The regulation uses the word "normally,"

indicating that Commerce retains the discretion to use data from more than one market-economy

country in valuing the various factors of production.  The statute contemplates situations in

which Commerce may need to rely upon data from more than one surrogate country in order to

fulfill its statutory obligation to value a factor of production according to the "best available

information."  *See* 19 U.S.C. § 1677b(c)(1) ("the valuation of the factors of production shall be

based on the best available information regarding the values of such factors in a market economy

country *or countries* considered to be appropriate by the administering authority." (emphasis

added)).  While the regulation expresses a preference for using information from only one

surrogate country (except for the labor factor of production), the regulation cannot be read so

broadly as to defeat the statutory directive that the factors of production be valued according to

the best available information.  In other words, the uniformity of data that results from having all

surrogate values determined according to data from the same surrogate country may be a

consideration in deciding which surrogate data to use for a particular factor of production.  But in

light of the statutory directive of 19 U.S.C. § 1677b(c)(1) to use the best available information

from a surrogate country "or countries," it cannot be the *sole* consideration.  The Department,

therefore, impermissibly failed to weigh the relative merits of the Peruvian inland freight data

because it determined that it had usable data from its primary surrogate country, where, as here, a

party to the administrative review specifically argued that the Peruvian inland freight data were

superior.

      The court, therefore, directs Commerce to reconsider its surrogate value for foreign

inland freight.  The court does not limit its directive to the reconsideration of whether to base the

surrogate value used to calculate inland freight on data from Thailand or data from Peru.  Upon

remand, Commerce must reconsider that decision, but it may also reconsider other findings made

that were necessary to the determination of the surrogate value for inland freight to ensure that its

findings are supported by substantial record evidence.  At this time, the court will not rule on the

other arguments that Qihang and Xugong presented in contesting the foreign inland freight

surrogate value.

### 3. Xugong's Claim Challenging the Selection of Thailand as the Surrogate Country

As discussed above, the antidumping duty statute provides generally that Commerce will

base the values of factors of production "on the best available information regarding the values

of such factors in a market economy country or countries" Commerce considers appropriate.

19 U.S.C. § 1677b(c)(1).  Because it provides for the use of information from "a market

economy country *or countries*," the statute does not confine Commerce to a single surrogate

country, contemplating that Commerce may consider it necessary or appropriate to use

information from more than one such country.  *Id.* (emphasis added).

The Department's regulation, discussed previously, expresses a preference for valuing all

factors of production, except labor, in a single country.  19 C.F.R. § 351.408(c)(2) ("Except for

labor, . . . the Secretary normally will value all factors in a single surrogate country.").  While the

regulation makes an exception for labor, *see id.* § 351.408(c)(3), that exception has been

invalidated by judicial decision.  *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1377 (Fed.

Cir. 2010).  A policy statement the Department issued explains that Commerce ordinarily will

value the labor factor of production according to data (obtained from Chapter 6A of the

International Labor Organization ("ILO") Yearbook) pertaining to the "primary" surrogate

country.  *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing*

*the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Int'l Trade Admin.

June 21, 2011).  The concept of a single "surrogate country" or a "primary surrogate country" is,

therefore, one grounded only in regulation and practice, not in the statute.  From the statutory

standpoint, the obligation is that Commerce value factors of production according to "the best

available information," 19 U.S.C. § 1677b(c)(1), regardless of the number of market economy

countries Commerce considers appropriate as sources for that information (subject to the

additional requirement that Commerce use, to the extent possible, information from market

economy countries that are economically comparable to China and that are significant producers

of comparable merchandise).

For the Final Results, Commerce designated Thailand as "the surrogate country," i.e., the

sole market economy country that would serve as the source for all information used in

determining surrogate values for the normal value calculation.  *See Final I&D Mem.* at 42 ("we

continue to find that Thailand is the appropriate surrogate country in this review.").  Xugong

claims that the record evidence compelled Commerce to choose Peru instead.  Xugong's Br. 6

("[T]he record supports the conclusion that Peru is not only the better choice, but the only choice

for which there is substantial record evidence.").  Because the court is requiring Commerce to

reconsider two surrogate values it based on data from Thailand (reclaimed rubber and foreign

inland freight) the court is not sustaining a decision to use Thai data exclusively in the normal

value determinations for the mandatory respondents.  But for the reasons discussed below,

neither does the court find merit in Xugong's claim that Commerce was required to choose Peru

as the sole or primary surrogate country.

As grounds for its claim, Xugong argued before Commerce that Peruvian surrogate value

data were superior to the Thai data for valuing natural rubber, for determining financial ratios,

and for valuing reclaimed rubber.  *See Resubmission of Xugong's Case Brief in the*

*Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of*

*China* 1-23 (Dec. 21, 2015) (P.R. Doc. 320) ("Xugong's Case Br.").  Before the court, Xugong

offers two additional arguments.  It argues that the ILO Chapter 6A data pertaining to Peru were

superior to those pertaining to Thailand because the Peruvian data were specific to the rubber

manufacturing industry whereas the Thai data were for manufacturing in general.  Xugong's

Br. 21-22.  It argues also that record data pertaining to Peru were superior to those from Thailand

for determining the surrogate inland freight cost.  *Id.*

 The court already has addressed the surrogate values for reclaimed rubber and foreign

inland freight cost, in each case concluding that Commerce must reconsider these values.  As to

the labor data, the court does not conclude that Commerce was required to find that the Peruvian

data were superior to the Thai labor data.

 During the review, petitioners placed on the record Thai labor data for the

"Manufacturing" industry from the National Statistical Office of the Government of Thailand.

*See Petitioner's First SV Submission* at Ex. 8.  The data were for the final quarter of 2013 and

the first three quarters of 2014, nearly contemporaneous with the POR.  *Id.*  Xugong placed on

the record Peruvian labor data from Chapter 6A of the ILO Yearbook, specifically for the

"Manufacture of Rubber and Plastics Products" industry.  *See Xugong Initial SV Submission*

at Ex. 10.  The data, however, were from 2008, so Xugong used a consumer price index inflator

of 115.12% (based on data from International Monetary Fund's World Economic Outlook

Database) to calculate its proposed surrogate value for labor.  *Id.*  Commerce found that the

record labor data supported its determination to select Thailand as its primary surrogate country

because Thailand "provides POR-contemporaneous labor data" while the record only contained

"non-contemporaneous labor data from 2008" for Peru.  *Final I&D Mem.* at 45.  Xugong

acknowledges that the Peruvian data for which it advocates are less contemporaneous with the

POR, Xugong's Br. 22 ("while it is true that the Thai labor rate data stems from the POR . . . "),

and instead argues that the Peruvian data are superior as they are "more industry-specific." *Id.*

Because each competing data set has a significant shortcoming, Commerce was within its

discretion in choosing the Thai labor data over the Peruvian labor data.

Xugong's remaining arguments pertain to the choice of data from which to calculate

financial ratios and the surrogate value for natural rubber.  The court addresses these arguments

below.

In determining normal value in a non-market economy proceeding, Commerce typically

calculates surrogate values for factory overhead expenses, for selling, general & administrative

("SG&A") expenses, and for profit, by calculating and applying "financial ratios" derived from

the financial statements of one or more producers of comparable merchandise in the primary

surrogate country.  *See* 19 C.F.R. § 351.408(c)(4).  For these purposes, Commerce used the

financial statements of three Thai companies.  It used the financial statement of Hihero Tyres

Co., Ltd. for the year ending December 31, 2013, and the financial statements of S.R. Tyres Co.,

Ltd., and Hwa Fong Rubber (Thailand) Public Company Limited ("Hwa Fong") for the year

ending December 31, 2014.  *Prelim I&D Mem.* at 36.  As Commerce stated in the Preliminary

Issues and Decision Memorandum, "[f]rom these Thai financial statements we were able to

determine factory overhead as a percentage of the total raw materials, labor, and energy

('ML&E') costs; SG&A as a percentage of ML&E plus overhead (*i.e.*, cost of manufacture); and

the profit rate as a percentage of the cost of manufacture plus SG&A."  *Id.* (footnote omitted).

Commerce found that each of these statements were from companies that produced "identical

merchandise," i.e., merchandise identical to the OTR tires that constituted the subject

merchandise. *Id.* at 25. Also influencing the Department's choice was that each of the three

statements broke out energy costs. *Id.*

Commerce noted that Xugong placed on the record complete financial statements for two

producers in Peru, one of which, Commerce found, was not usable because it did "not adequately

break out energy costs." *Id.* Commerce concluded that basing its financial ratios on three usable

financial statements was preferable to basing them on one usable statement. *Id.* Commerce

found, further, that the usable Peruvian statement (like the unusable one) was that of a company

that produced comparable, as opposed to identical, merchandise. *Id.* Before the court, Xugong

argues that the Peruvian financial statements are preferable to the Thai financial statements.

Xugong's Br. 13-21. It offers several arguments in support of this contention.

Xugong argues, first, that the financial statement on the record pertaining to Hwa Fong

does not support a finding that this company produced merchandise identical to the subject

merchandise. *Id.* at 13-17. The financial statement, it asserts, indicated that "the principal

businesses of the Company are manufacturing and distribution of tires and tubes for bicycles,

motorcycles and small logistics vehicles." *Id.* at 13 (citation omitted). Further to this argument,

it asserts that in a past investigation of Chinese tires for passenger cars and light trucks,

Commerce declined to use Hwa Fong's financial statement due to record information that the

company produced bicycle and motorcycle tires, which were not merchandise subject to that

investigation. *Id.* at 13-14. Xugong argues that in rejecting its argument in the Final Results,

Commerce impermissibly relied on a "2013 Tire Business Global Tire Report which states that

Hwa Fong is a producer of agricultural, motorcycle, and industrial tires" and that agricultural and

industrial tires "typically include off-the-road tires covered by the scope of the order." *Final

I&D Mem.* at 49 (footnote omitted). Xugong points to other record evidence indicating that the

Global Tire Report contained information that predated the POR and also was unreliable because it conflicted with record information pertaining to other Thai producers. *Id.* at 14-17. Xugong's arguments concerning the nature of the merchandise produced by Hwa Fong during the POR might have merit, but they are to no avail. Commerce concluded that even if Hwa Fong could be shown to be only a producer of comparable and not identical merchandise, the financial statements for the Thai companies, which broke out energy costs and pertained to two producers of identical merchandise and one producer of comparable merchandise, still would be superior to the single usable Peruvian financial statement, which was of a producer of comparable merchandise. *Final I&D Mem.* at 49. This logical conclusion is supported by substantial evidence consisting of the financial statements on the record.

Xugong also argues that the financial statements of the two Peruvian companies that it submitted for the record, those of Goodyear del Peru S.A. ("Goodyear Peru") and Lima Caucho S.A. ("Lima Caucho"), are usable. Specifically, Xugong argues that the financial statement for the latter "very clearly indicates 'fabrication costs'" and that this category includes energy and labor, such that Commerce, having labor cost data, could derive the energy cost information. Xugong's Br. 19-20. Commerce responded to this argument for the Final Results, explaining, quite reasonably, that it prefers not to "go behind" the numbers in a financial statement or "rely on supposition." *Final I&D Mem.* at 48.

Even were Commerce to have accepted Xugong's argument that it could have used both the Goodyear Peru and Lima Caucho statements, it still would have been left with a record upon which it had three statements from Thailand as opposed to only two from Peru. Xugong has not made the case that the record statements from Peruvian companies constituted, on the whole, a superior set of data compared to those from the companies in Thailand. Xugong appears to

concede this point, stating that "Commerce cannot point to substantial evidence that there is a significant difference in the overall quality of financial statement data on the record between Thailand and Peru." Xugong's Br. 17.

Xugong's argument concerning the natural rubber surrogate value is twofold. It argues, first, that the data Commerce used cannot be shown by substantial evidence to be free of tax and, in that respect, are inferior to GTA import data from Peru. Xugong's Br. 6-11. Second, it argues that the choice of surrogate value for natural rubber, which it argues was of negligible importance because this was but a minor production input, should not be a factor in favoring Thailand over Peru as the principal surrogate country. *Id.* at 11-13.

Commerce chose a surrogate value of $2.01 per kilogram for technically specified natural rubber and a surrogate value of $2.28 for natural rubber in ribbed smoked sheets, both of which values it obtained by calculating an average of daily prices during the POR, as reported by the Rubber Research Institute of Thailand ("RRIT") and compiled by the Association of Natural Rubber Producing Countries ("ANRPC"). *Final I&D Mem.* at 50-53; *see Final Surrogate Value Mem.* at Attach. I.

Both Xugong and Qihang argued during the review that Peruvian GTA import data on natural rubber were better information than the domestic Thai data (the RRIT data) Commerce used, contending that the record did not establish that the RRIT data were free of taxes. *Final I&D Mem.* at 50. Rejecting this argument in the Final Issues and Decision Memorandum, Commerce concluded that the RRIT data were the better choice. *Id.* at 53. Commerce stated its reasoning as follows:

> Because the Department finds that: 1) the RRIT data are sourced from the primary surrogate and comports with its SV [surrogate value] selection criteria of publicly available, non-export, tax-exclusive, and product-specific data; 2) no party has argued that the data are non-specific, inaccurate, aberrational, inappropriate, or

> that case specific factors otherwise disqualify their use; and, 3) because the
> Department has a preference to value all surrogate values within the same
> surrogate country, we continue to use the RRIT data in the *Final Results.*

*Id.* at 52 (footnote omitted).  Commerce summarized its findings by stating that "[a]s outlined

above, both sources are tax and duty exclusive and both are publicly available.  Concerning

specificity, the RRIT prices are tracked daily and based on the two specific types of natural

rubber used by respondents in production, whereas Peruvian import data from GTA are only a

monthly value for imports under an HTS heading for natural rubber generally, indicating that the

RRIT prices are at least as specific and accurate as import prices."  *Id.* at 53 (footnote omitted).

Before the court, Xugong again argues that the record evidence does not demonstrate that

the RRIT data were free of taxes.  Xugong's Br. 6-11.  The court notes that Commerce did not

reach an unqualified finding that the RRIT data were tax-exclusive.  Responding to the objection

of the mandatory respondents, Commerce asserted that "the RRIT domestic prices are

tax-exclusive (or at a minimum, that there is no affirmative evidence that they contain taxes, *see*

the discussion below), and no party contested the preliminary finding that they are publicly

available, non-export, and product-specific prices for the POR."  *Final I&D Mem.* at 51.  The

later discussion addressed the respondents' argument that a footnote pertaining to natural rubber

prices in India indicated that the Thai natural rubber prices likely included domestic taxes.

Commerce concluded that "it is reasonable to conclude that the RRIT prices are likely presented

without taxes."  *Id.* at 52.  This, too, is not an unqualified finding.

Xugong explains that it "does not argue that the Thai data necessarily includes taxes,

because as noted above, there is nothing explicit on the record one way or the other."  Xugong's

Br. 10.  Xugong notes that Commerce has an established preference for the use of import data

over domestic price data due to exclusivity from tax, as stated in the Department's "Antidumping

Manual." *Id.* at 10-11.  The court agrees with Xugong's argument that the Thai data are not

shown by substantial evidence to be free of tax, which is one of the Department's factors for

choosing surrogate values.  The Department's other reasons for choosing the domestic Thai data

were that the Thai data "were at least as specific" to the input and were obtained from the chosen

surrogate country, Thailand.  As to specificity, the record GTA data for Peru, as shown in

Xugong's initial surrogate value submission, were contemporaneous with the POR only for the

tariff subheading Xugong listed for technically-specified natural rubber (September 2013 to

August 2014) but were two years out of date for the tariff subheading it provided for natural

rubber in smoked sheets (September 2011 to August 2012), for which Xugong supplied an

inflator of 1.0607.  *See Xugong Initial SV Submission* at Ex. 7.

Xugong challenged specifically the surrogate value for reclaimed rubber, as discussed

previously in the Opinion and Order.  The court does not interpret Xugong's Rule 56.2 brief as

specifically challenging the natural rubber surrogate values.  Instead, it raises the argument only

in support of its claim that Commerce was required to choose Peru as the sole or primary

surrogate country and, even in that context, minimizes the importance of the natural rubber

surrogate values to the choice of surrogate country.[11]  Xugong's claim does not persuade the

court, if for no other reason than the financial data, which have a significant effect on the

---

[11] The surrogate values Xugong proposed for natural rubber were less favorable to it than
the values Commerce used.  For natural rubber in smoked sheets, the competing values were
$4.86 per kilogram (based on the Peruvian GTA data) as opposed to $2.28 per kilogram (based
on the RRIT data) and for technically specified natural rubber, the competing values were $2.34
per kilogram (based on the Peruvian GTA data) as opposed to $2.01 per kilogram (based on the
RRIT data).  *Compare Provision of Initial Surrogate Values by Xuzhou Xugong Tyres Co. Ltd.* at
Ex. 7 (Mar. 19, 2015) (P.R. Docs. 128-32), *with Final Results of the 2013-2014 Administrative
Review of the Antidumping Duty Order on Certain New Pneumatic off-The-Road Tires from the
People's Republic of China: Surrogate Value Memorandum* at Attach. I (Apr. 12, 2016) (P.R.
Doc. 336).

margins, do not favor Peru, as discussed above.  Moreover, Commerce used Thai data to value

numerous production inputs that were not challenged in this case.  While the court has concluded

that Commerce must reconsider its surrogate values for reclaimed rubber and for foreign inland

freight, the record provides the court no valid basis to respond affirmatively to Xugong's claim

that the record compelled Commerce to choose Peru as the sole or principal surrogate country by

ordering reconsideration of all other surrogate values used by Commerce.

<u>E. The Use of Facts Otherwise Available and an Adverse Inference in the Calculation of
Xugong's Margin</u>

Commerce issued its initial questionnaire on December 17, 2014, instructing Xugong on

the reporting of its sales of subject merchandise for the sixth review.  *Questionnaire* at C-1

(Dec. 17, 2014) (P.R. Doc. 34).  Commerce issued a supplemental questionnaire to Xugong on

May 1, 2015 requesting that Xugong report certain additional sales of subject merchandise.

*Supplemental Section C and D Questionnaire* 3 (May 1, 2015) (P.R. Doc. 174) ("*First Supp.*

*Questionnaire*").  The supplemental questionnaire requested that Xugong report "all EP and CEP

sales which were invoiced during the POR, regardless of when they shipped or when they

entered the United States" and to also "include any sales (if any) which shipped prior to the end

of the POR but were not invoiced until after the POR."  *Id.* at 4.  Commerce issued an additional

supplemental questionnaire to Xugong on May 7, 2015.  *Second Supplemental Sections A, C, and*

*D Questionnaire* (May 7, 2015) (P.R. Doc. 175).  Xugong responded to these supplemental

questionnaires on June 2, 2015.  *Xuzhou Xugong Tyres Co., Ltd., ("Xugong") Supplemental A,*

*C, and D Questionnaire Response the Administrative Review of New Pneumatic Off-The-Road*

*Tires from the People's Republic of China* (June 2, 2015) (P.R. Docs. 191-97).

During a verification Commerce conducted at Xugong's U.S. affiliate, Commerce found

that Xugong's reported sales database, as augmented in the June 2, 2015 supplemental

questionnaire response, did not include certain CEP sales of subject merchandise that Commerce had requested in the May 7, 2015 supplemental questionnaire. *Final I&D Mem.* at 11. Each of the sales Commerce found to have been unreported were of subject merchandise "direct shipped" from Xugong's factory in China to the downstream U.S. customer during the POR and invoiced by the U.S. affiliate, ATI, after the close of the POR on August 31, 2014. *Id.* Commerce decided to use facts otherwise available, with an adverse inference, as a substitute for the missing sales information. For this purpose, Commerce used "the highest CONNUM-specific direct-shipped CEP sale margin as AFA ["adverse facts available"] for these missing sales." *Id.* at 12 (footnote omitted).

Xugong claims that "Commerce's determination to apply AFA in this situation is unsupported by substantial evidence." Xugong's Br. 45. The court does not find merit in this claim. While invoking the "substantial evidence" element of the standard of review, Xugong does not dispute the principal finding supporting the use of facts otherwise available, which was that the augmented sales database Xugong submitted in its June 2, 2015 questionnaire response did not include all of its CEP sales that were direct-shipped during the POR but invoiced after the POR. Nor does Xugong make the case that Commerce erred in using an adverse inference.

### 1. The Use of Facts Otherwise Available Is Warranted Because Commerce Reached a Valid Finding that Xugong Failed to Provide Requested Information

Under 19 U.S.C. § 1677e(a)(2)(B), when a respondent fails to provide requested information, Commerce is directed generally to use the facts otherwise available in reaching the applicable determination. Under § 1677e(a)(2)(D), Commerce is directed generally to use the facts otherwise available if the information provided cannot be verified. Commerce invoked both of these provisions in resorting to facts otherwise available. *Final I&D Mem.* at 15. The directive in the May 1, 2015 supplemental questionnaire to "include any sales (if any) which

shipped prior to the end of the POR but were not invoiced until after the POR," is unambiguous

(albeit redundant as to the second inclusion of the word "any"). *First Supp. Questionnaire* at 4.

It made no exception for sales of merchandise that entered after the POR.  Because Xugong did

not report those direct-shipped, CEP sales that were shipped during the POR but were invoiced

after the POR (a finding Xugong does not dispute), Commerce correctly invoked

subparagraph (B) of 19 U.S.C. § 1677e(a).  Therefore, the court does not reach the question of

whether the information Xugong did provide was verifiable for purposes of subparagraph (D).

Xugong advances various, and unavailing, arguments as to why Commerce should not

have used the facts otherwise available.  Xugong points out, first, that Xugong correctly followed

the instructions on reporting of sales that unambiguously were set forth in the Department's

initial questionnaire and were consistent with the Department's established practice.  Xugong's

Br. 46-52.  It then argues that the supplemental questionnaire, which went beyond the "standard"

reporting instructions, is inconsistent with the Department's past practice on the reporting of

sales that will be used to determine a respondent's margin.  According to Xugong's argument,

the Department's practice, with two exceptions not here applicable, is to analyze sales data on

entries occurring during the POR, rather than all sales occurring during the POR.  *Id.* at 46.

These arguments are not persuasive because the relevant issue is whether Xugong submitted all

of the information requested in the May 1, 2015 supplemental questionnaire.  Because it did not,

Xugong's compliance with the reporting requirements in the initial questionnaire is irrelevant.

And even if the court were to presume, *arguendo*, that Commerce had a practice under which it

did *not* request information on CEP sales that were shipped, but not invoiced or entered, within

the POR, it would not change the court's conclusion.  Commerce is not required to conform the

scope of its information requests to the scope of those it has issued in the past.

Xugong argues, further, that "[d]espite the accuracy of Xugong's initial identification of the proper sales to report, Commerce issued a confused initial supplemental questionnaire on May 1, 2017." *Id.* at 57. Positing that Commerce requested reporting of sales in the initial questionnaire and the supplemental questionnaire on different methodologies, Xugong also contends that the questionnaires were in "conflict," *id.* at 59, and that "Commerce issued contradictory instructions." *Id.* at 70. Xugong cites *Ad Hoc Shrimp Trade Action Committee v. United States*, 33 CIT 1906, 675 F. Supp. 2d. 1287 (2011), in which Commerce declined to apply facts otherwise available with an adverse inference upon discovering it had issued conflicting reporting instructions. In this case, the directive to report *any* sales shipped during the POR, with no stated limitation as to when the merchandise was entered, was not ambiguous or otherwise unclear, and it is a mischaracterization to describe the reporting requests as conflicting. Because the May 1, 2015 supplemental questionnaire required Xugong to report sales in addition to those Xugong previously reported, it was not merely a clarification of the initial information request. *Final I&D Mem.* at 9 ("The Department requested that Xugong continue to report the same universe of sales that it had previously reported, but also to add these additional sales to its U.S. sales database.").

Xugong also maintains that in its June 2, 2015 response to the supplemental questionnaires it "made clear to Commerce that it had reported its direct-shipment CEP sales to Commerce based on having an entry date within the POR, and moreover that it did not report direct-shipment CEP sales shipped within the POR but which entered after the POR." Xugong's Br. 63. Xugong submits that it reasonably presumed that it had reported all additional sales requested by Commerce. *Id.* at 65. It argues that "[i]f Commerce had any confusion on the matter, it could simply have reviewed the database, and it would have noted that there were no

sales reported with an entry date after the POR" and that "Commerce issued no further

supplemental questions on this point, even though it did find the time to issue another

supplemental questionnaire to Xugong on June 26, 2015." *Id.* at 66-67 (citing *Third

Supplemental Sections C and D Questionnaire* 1 (June 26, 2015) (P.R. Doc. 212)).  According to

Xugong, "Commerce's failure to ask any further questions of Xugong regarding this matter led

to Xugong's understandable belief that whatever issue Commerce had with what constituted the

proper sales universe had been resolved." *Id.* at 67.  These arguments incorrectly presume that

Commerce may not use facts otherwise available in response to unreported information if it does

not discover the deficiency and notify the submitter as soon as it possibly could have, or before it

issues a second supplemental questionnaire on the same subject matter.  Although the statute

requires Commerce to notify a submitter promptly, 19 U.S.C. § 1677m(d), Commerce did so

upon discovering the unreported sales at verification.  Under the circumstances shown by the

record, it was not reasonable for Xugong to interpret the Department's silence as acquiescence.

Maintaining that Commerce, as a result of Xugong's response to the initial questionnaire,

had all the information required for calculating an accurate dumping margin, Xugong argues that

Commerce need not have, and should not have, requested reporting of sales for which neither the

date of entry nor the date of shipment occurred during the POR.  *Id.* at 67-68.  "Xugong notes

that it is being punished by Commerce for the fact that it did not report sales that Commerce did

not initially request, and for which Commerce has provided no legal, precedential, policy, or

otherwise rational basis for demanding in the first place." *Id.* at 68.  Xugong does not

demonstrate that Commerce acted beyond its authority in deciding that the CEP sales of

merchandise shipped during the POR but not entered or invoiced during the POR should be

included in the universe of sales examined to determine a margin for Xugong.  Although the

statute provides that Commerce, as a general matter, will determine a dumping margin for "each entry" subject to an administrative review, 19 U.S.C. § 1675(a)(2)(A)(ii), the statute does not require a perfect correspondence between examined sales and entries during a period of review, and often tying every U.S. market sale to a particular entry is not practicable.  The Department's regulations recognize this point.  *See* 19 C.F.R. § 351.213(e)(1) (providing that an administrative review normally will cover, as appropriate, entries, exports, or sales during the POR).  The sales Xugong did not report in response to the Department's request were exported during the POR. Also, Commerce used "shipment date to define the universe of sales" after finding that "the terms of sale are fixed at the time of shipment."  *Final I&D Mem.* at 13.  While objecting to the Department's supplemental information request, it does not specifically contest this finding.  *See* 19 C.F.R. § 351.401(i) (providing that in identifying the date of sale of subject merchandise, Commerce normally will use invoice date unless "a different date better reflects the date on which the exporter or producer establishes the material terms of sale.").

2. The Use of an Adverse Inference Was Warranted Based on a Finding that Xugong Did Not Act to the Best of Its Ability in Responding to the May 1, 2015 Supplemental Questionnaire

Commerce found that "Xugong failed to act to the best of its ability in this review by not reporting the full universe of sales," *Final I&D Mem.* at 15, in responding to the request in the May 1, 2015 supplemental questionnaire, a finding supported by substantial record evidence. Xugong did not comply with the Department's clear and unambiguous instructions in reporting its sales database, yet it does not give a reason why it would have been unable to comply fully with the Department's request.  If Xugong misinterpreted the request to mean that it should report only shipments of merchandise entered during the POR, its doing so could only have been the result of a lack of care in following the Department's unambiguous instructions and not a fault on the part of Commerce.  Rather than argue that it used its best efforts in attempting to

satisfy the Department's request for the additional sales information, it argues, unconvincingly, that Commerce somehow was at fault, for various reasons, in making the request and in structuring the various questionnaires in the way that it did.  Based on the record evidence considered as a whole, Commerce was justified in invoking its authority under 19 U.S.C. § 1677e(b) to use an adverse inference in choosing from among the facts otherwise available.

### F. Trelleborg's Claims that Commerce Unlawfully Assigned it the "All-Others" Rate

In what are essentially three separate claims, Trelleborg challenges the Department's decision in the Final Results to assign it the "all-others" rate of 70.55% that Commerce derived as a weighted average of the individual margins of the two mandatory respondents.  Trelleborg claims, first, that Commerce acted unlawfully in selecting only Xugong and Qihang, and not Trelleborg, as mandatory respondents, i.e., as respondents initially chosen for individual examination and assignment of individual weighted-average dumping margins.  Trelleborg's Br. 20-26.  Second, Trelleborg claims that even as an unexamined respondent it should not have been assigned the 70.55% rate because that rate was unreasonable as applied to Trelleborg, which received a zero margin in a just-completed new shipper review and asserts that it would have received a very low margin (which Trelleborg calculates as one between 1.79% and 2.03%) had it been examined individually in the sixth review.  *Id.* at 10-18.  Finally, Trelleborg claims that Commerce unlawfully denied its request to participate in the sixth review as a voluntary respondent.  *Id.* at 26-30.  As discussed below, the court concludes that Trelleborg does not qualify for a remedy on any of these claims.

### 1. The Department's Decision to Examine Only Xugong and Qihang, and Not Trelleborg, as Mandatory Respondents

Commerce initially selected two companies, Xugong and Guizhou Tyre Co., Ltd. (together with an affiliate, Guizhou Tyre Import and Export Co., Ltd.; collectively, "GTC") for

individual examination as mandatory respondents, based on its finding that these two companies

accounted for the largest volume of exports of subject merchandise to the United States during

the POR. *Prelim. I&D Mem.* at 3 n.9. After GTC withdrew its review request, Commerce

selected as a second mandatory respondent Qihang, which it found to be the next largest, i.e.,

third largest overall, exporter of subject merchandise to the United States during the POR. *Id.*

For the Final Results, Commerce stated that "[a]lthough the Department selected Qihang as a

mandatory respondent following GTC's withdrawal, we specified that there has been no change

in circumstance that would warrant the Department to revisit its determination that it would not

be practicable to individually examine all requested producers and exporters, and that the

Department could examine no more than two producers or exporters of subject merchandise."

*Final I&D Mem.* at 32 n.193. Commerce based its conclusion that it would not be practicable to

examine individually more than two respondents on its workload and the associated

administrative burden that would result from a third individual examination. *Respondent*

*Selection* 1 (Dec. 16, 2014) (P.R. Doc. 32).

    In explaining its decision to select only Xugong and Qihang, and not Trelleborg, as the

mandatory respondents, Commerce acknowledged the "general rule" of 19 U.S.C.

§ 1677f-1(c)(1), which provides that "[i]n determining weighted average dumping margins

under . . . section 1675(a) of this title [which applies to reviews of antidumping duty orders], the

administering authority shall determine the individual weighted average dumping margin for

each known exporter and producer of the subject merchandise." *Id.* at 30. Commerce relied on a

statutory exception to the general rule, which Congress provided in § 1677f-1(c)(2). *Id.* The

latter provision gives Commerce authority to limit its examination of exporters or producers "[i]f

it is not practicable to make individual weighted average dumping margin determinations under

paragraph (1) because of the large number of exporters or producers involved in the investigation

or review." 19 U.S.C. § 1677f-1(c)(2). The provision allows Commerce to limit its examination

in two ways: it may limit its examination to a statistically valid sample of exporters, producers,

or types of products, *see* § 1677f-1(c)(2)(A), or it may limit its examination to "exporters and

producers accounting for the largest volume of the subject merchandise from the exporting

country that can be reasonably examined," *see* § 1677f-1(c)(2)(B). In explaining its decision to

invoke its discretion under paragraph (B) of § 1677f-1(c)(2), Commerce stated its conclusion that

the two respondents it selected, i.e., Xugong and Qihang, are representative of producers of the

subject merchandise. *Id.* at 31. Commerce further explained that the all-others rate it calculated

based on the individual margins of Xugong and Qihang "is drawn from a large universe of sales

which are representative of off-the-road tire manufacturers' experiences" and "bears a

relationship to TWS Xinghai's [Trelleborg's] economic reality." *Id.* at 32 (footnote omitted).

　　Trelleborg raises various objections to the Department's mandatory respondent selection.

It argues, first, that failing to include Trelleborg was contrary to the statute because, "the basic

purpose of the statute" being "to compute fair and accurate dumping margins," Commerce must

ensure that margins assigned to non-mandatory, cooperative separate rate respondents "bear

some relationship to their actual dumping margins" rather than be "untethered to actual record

data for Trelleborg." Trelleborg's Br. 10-12. This argument does not convince the court. The

method Congress expressly provided for in 19 U.S.C. § 1677f-1(c)(2)(B) necessarily produces an

"all-others" rate that is "untethered to actual record data" on the sales of individual, unexamined

respondents. Any "relationship to their actual dumping margins" that exists under

§ 1677f-1(c)(2)(B) is, by definition, the relationship that exists because the examined

respondents are treated as representative of other respondents by virtue of being the largest

exporters.  Commerce assigned a margin based on the margins of the two largest exporters to the

unexamined ("separate rate") respondents because it concluded that the circumstance described

in § 1677f-1(c)(2) existed, notwithstanding the margin that an unexamined respondent would

have been assigned had it been individually examined.

Trelleborg argues that the mandatory respondents are not representative of it because, as

a foreign-owned company (in this case, one owned by a company in a market economy country,

Sweden), it "has a different pricing and cost structure than would be expected from

Chinese-owned enterprises, regardless of whether they are state-owned or free from state

control."  Trelleborg's Br. 19 (citations omitted).  As examples, it points out that it differed from

Xugong in terms of its specific products, its market economy purchase inputs, its relative

percentages of synthetic rubber, natural rubber, and reclaimed rubber used for all of its products,

and its AUVs.  *Id.*  According to Trelleborg, "Commerce is required to evaluate the commercial

reality facing each company to determine whether the companies' economics are comparable."

*Id.*  This argument presumes, incorrectly, that Congress intended to limit the application of

19 U.S.C. § 1677f-1(c)(2)(B) according to a comparative analysis of the factors Trelleborg

highlights.  Congress instead provided Commerce authority to examine individually producers

and exporters of subject merchandise based on largest export volumes.  *See* 19 U.S.C.

§ 1677f-1(c)(2)(B).

Trelleborg takes issue with the decision to perform individual examinations of only two

respondents based on a justification of the current and anticipated workload of the Department's

investigative office assigned to the proceeding.  *Id.* at 25.  It argues that "the administrative

convenience of Commerce cannot trump statutory mandates of accuracy, reasonableness, and

fidelity to commercial and economic reality" and that "[i]t is simply not true that the two largest

exporters in any given industry will be representative of all others." *Id.* at 26.  Commerce

determined that examining individually only Xugong and Qihang was appropriate based on the

statutory authority to examine the "exporters and producers accounting for the largest volume of

the subject merchandise from the exporting country that can be reasonably examined."

19 U.S.C. § 1677f-1(c)(2)(B).  The record evidence supports the Department's finding that the

two mandatory respondents were not only the two largest (other than GTC, for which the review

request had been withdrawn) but also accounted for a substantial portion of the subject

merchandise exports of all exporters and producers for which Commerce had remaining requests

for review.  *See Selection of Second Respondent for Individual Review* at Attach. I

(Dec. 19, 2014) (P.R. Doc. 38).  Moreover, Trelleborg has not demonstrated that, even had

Commerce selected an additional mandatory respondent based on export volume of subject

merchandise, it would have been the party designated under the method of selecting respondents

for individual examination provided in 19 U.S.C. § 1677f-1(c)(2)(B).  *See, e.g.*, *id.*  Commerce

therefore had a basis, grounded in substantial record evidence and according to a

statutorily-authorized method, to conclude that the two largest exporters were representative of

all exporters and producers for which review had been requested.

### 2. The Assignment of the 70.55% "All-Others" Rate to Trelleborg

Trelleborg argues that assigning it the 70.55% rate had the effect of denying it any

meaningful benefit from a new shipper review of Trelleborg, in which Commerce assigned

Trelleborg a zero margin.  *Id.* at 15-17.  But if that is so, that result is a permissible one under the

statutory scheme.  Trelleborg is correct that the zero margin produced a rate that was in effect for

entries made only during a limited time, the new shipper review having been completed on

June 4, 2013, less than three months prior to the beginning of the POR (September 1, 2013

through August 31, 2014). *See id.* at 17.  But the statute authorized—and, upon the receipt of a valid request, indeed required—the inclusion of Trelleborg in the sixth review.  Trelleborg, therefore, cannot demonstrate that the relationship between the new shipper review and the sixth periodic administrative review made Trelleborg's receiving the 70.55% all-others rate violative of the statute *per se*.  Moreover, as Commerce pointed out, the zero margin Trelleborg received in the new shipper review was based on a single sale.  *Final I&D Mem.* at 37.

Trelleborg maintains that the assignment of the 70.55% all-others rate was unreasonable because had Commerce calculated a margin using Trelleborg's own data, that margin would have been between 1.79% and 2.03%.  *Id.* at 12-15.  This assertion relies upon information related to Trelleborg's own sales, which information Commerce did not examine because Trelleborg was not an individually-examined respondent.  But in light of the statutory provisions upon which Commerce was conducting the review, Trelleborg does not make the case that Commerce, on this record, was *required* to designate Trelleborg as a third mandatory respondent. Therefore, it is unavailing for Trelleborg to assert that it would have been assigned a margin between 1.79% and 2.03% had it been individually examined.

### 3. The Department's Denial of Trelleborg's Request to Be a Voluntary Respondent

In the Preliminary Results, Commerce announced that it was rejecting a request by Trelleborg for voluntary respondent status under section 782(a) of the Tariff Act, 19 U.S.C. § 1677m(a).  *Prelim I&D Mem.* 6-10.  Commerce confirmed this decision for the Final Results and reiterated its reasoning.  *Final I&D Mem.* at 30-38.

Under 19 U.S.C. § 1677m(a), if Commerce has limited the number of exporters or producers individually examined according to 19 U.S.C. § 1677f-1(c)(2), it must, in a certain circumstance, "establish an . . . individual weighted average dumping margin for any exporter or

producer not initially selected for individual examination" who submits to Commerce the information requested from the mandatory respondents by the date the mandatory respondents were required to submit such information.  19 U.S.C. § 1677m(a)(1).  That circumstance exists when "the number of exporters or producers subject to the investigation or review is not so large that any additional individual examination of such exporters or producers would be unduly burdensome to the administering authority and inhibit the timely completion of the investigation or review."  *Id.* § 1677m(a)(1)(B).  Trelleborg claims that the Department's denial of its request to be a voluntary respondent was unlawful, arguing that the "number of exporters or producers subject to the investigation or review," was "not so large that any additional individual examination" of it would have been "unduly burdensome" or "inhibited the timely completion" of the review.  *Id.*

There is no dispute that Trelleborg voluntarily submitted the information requested of the mandatory respondents by the required date.  *Prelim. I&D Mem.* at 8; *Final I&D Mem.* at 28.  Commerce rejected the voluntary respondent request, citing resource constraints.  In doing so, Commerce relied upon an amendment to the statute made by the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 506, 129 Stat. 362, 386-87 (2015) ("TPEA").  The TPEA added to 19 U.S.C. § 1677m(a) a new provision (now subsection § 1677m(a)(2)), entitled "Determination of unduly burdensome," under which Congress provided three specific factors, and a general "catch-all" factor, that Commerce "may consider" "[i]n determining if an individual examination under paragraph (1)(B) [i.e., § 1677m(a)(1)(B)] would be unduly burdensome."[12]  19 U.S.C. § 1677m(a)(2).

---

[12] The new subsection provides that:
(continued . . .)

Under the first factor ("[t]he complexity of the issues or information presented in the

proceeding, including questionnaires and any responses thereto"), Commerce concluded that "the

issues, and information presented in this review are complex," adding that "analysis of both

Xugong and Qihang was complicated due to Xugong's multiple subsidiaries and affiliates as

well as both EP and CEP sales, and Qihang's use of tollers and wide variety of terms of sale."

*Final I&D Mem.* at 33 (footnote omitted).  Commerce mentioned that "we have issued four

supplemental questionnaires to Xugong and five supplemental questionnaires to Qihang in this

review, which included numerous questions concerning the factors of production reporting

methodologies, database issues, ownership issues, and general administrative issues."  *Id.*

In apparent reference to the second factor, "[a]ny prior experience of the administering

authority in the same or similar proceeding," *see* 19 U.S.C. § 1677m(a)(2)(B), Commerce noted

that "this was the first time that we have reviewed Qihang as a mandatory respondent and, thus,

the Department had to expend additional time gaining experience with Qihang's records and

practices."  *Id.*  Commerce also mentioned that approving the request "would necessarily have

---

(. . . continued)
In determining if an individual examination under paragraph (1)(B) would be
unduly burdensome, the administering authority may consider the following:
(A) The complexity of the issues or information presented in the
proceeding, including questionnaires and any responses thereto.
(B) Any prior experience of the administering authority in the same or
similar proceeding.
(C) The total number of investigations under part I [countervailing duty
investigations] or part II [antidumping duty investigations] of this subtitle and
reviews under section 1675 of this title being conducted by the administering
authority as of the date of the determination.
(D) Such other factors relating to the timely completion of each such
investigation and review as the Administering Authority considers appropriate.

19 U.S.C. § 1677m(a)(2).

required a significant additional level of effort and resources" that would be "unduly

burdensome," including the assignment of additional analysts.  *Id.* at 34.

Trelleborg argues that Commerce, in denying its request for voluntary respondent status

using the same rationale it used to limit the review to the two examined, i.e., mandatory,

respondents, failed to recognize that denying such a request requires a higher threshold of agency

burden than does limiting respondents generally.  Trelleborg's Br. 26-30.  According to

Trelleborg, Commerce ignored the fact that Trelleborg was the only prospective voluntary

respondent that submitted the necessary information and the fact that it previously examined

Trelleborg in the new shipper review.  *Id.* at 29-30.  Trelleborg submits that because it provided

Commerce "a dumping margin program that Commerce could have used if it wanted," the

burden on Commerce "was as minimal as it could be with any voluntary respondent" and did not

qualify as an "undue" burden.  *Id.* at 30.

Trelleborg's arguments are not persuasive.  In the TPEA, Congress provided Commerce

with broad discretion in deciding whether or not to accept a request for voluntary respondent

status.  In support of its decision, Commerce applied factors Congress considered appropriate,

including complexity of the review and it other resource commitments, in rejecting Trelleborg's

request.

### G. The All-Others Rate as Applied to Full World and Weihai Zhongwei

Full World and Weihai Zhongwei were assigned the all-others rate of 70.55% in the sixth

review.  *Final Results*, 81 Fed. Reg. at 23,273-74.  As plaintiffs in this case, they seek relief in

the form of a redetermined all-others rate based on any revision to the rates of the examined

respondents.  At oral argument, defendant indicated that Commerce does not oppose this claim,

should it be determined judicially that revision in the rates of the examined respondents is

required.  Because Full World and Weihai Zhongwei contested the Final Results as plaintiffs,

they will qualify for any relief that ultimately is determined judicially to apply to their margins.

Because it also contested the Final Results, Trelleborg will qualify for any such relief as well.

### III. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands to Commerce the decision

published as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China:*

*Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 23,272

(Int'l Trade Admin. Apr. 20, 2016) ("Final Results") for reconsideration according to the

conclusions the court reaches in this Opinion and Order.  Therefore, upon consideration of all

papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce shall submit a new determination upon remand ("Remand Redetermination") in which it recalculates export price and constructed export price for Xugong and Qihang without making deductions for Chinese value-added tax; it is further

**ORDERED** that, in the Remand Redetermination, Commerce shall reconsider, and redetermine as necessary, the surrogate values for reclaimed rubber and foreign inland freight; it is further

**ORDERED** that Commerce will recalculate the margins for Xugong and Qihang and also the margin to be assigned to Trelleborg, Full World, and Weihai Zhongwei; it is further

**ORDERED** that Commerce will submit its Remand Redermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that comments of plaintiffs on the Remand Redetermination must be filed with the court no later than 30 days after the filing of the Remand Redetermination; and it is further

**ORDERED** that the response of defendant to the aforementioned comments must be filed no later than 15 days from the date on which the last comment is filed.


/s/Timothy C. Stanceu
Timothy C. Stanceu, Chief Judge


Dated:  April 4, 2018
         New York, New York